Filed 8/26/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| EDDIE YAU,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>SANTA MARGARITA FORD, INC., et al.,<br><br>    Defendants and Respondents. | G048013 consol. w/ G048343<br><br>(Super. Ct. No. 30-2011-00448900)<br><br>O P I N I O N |

Appeals from judgments of the Superior Court of Orange County, Andrew P. Banks, Judge.  Affirmed in part; reversed in part and remanded.

Skanadore Reisdorph Law Office and Deborah S. Reisdorph for Plaintiff and Appellant.

Gordon & Rees LLP, Roger M. Mansukhani, Gina H. Lindell, Matthew G. Kleiner, and Craig D. Nickerson for Defendants and Respondents.

Eddie Yau filed a complaint against his former employer, Santa Margarita Ford, alleging a cause of action for wrongful termination in violation of public policy. Yau alleged he was terminated after complaining to Santa Margarita Ford's management about fraudulent warranty repair claims being submitted to Ford Motor Company (Ford). Yau also alleged an intentional infliction of emotional distress cause of action against individual defendants who were his coworkers and supervisors, and the owner of Santa Margarita Ford.

The trial court sustained demurrers without leave to amend and dismissed the action, entering separate judgments for Santa Margarita Ford and the individual defendants. We conclude Yau adequately pleaded his wrongful termination cause of action and therefore the judgment in favor of Santa Margarita Ford must be reversed and the matter remanded as to that cause of action. We conclude the trial court correctly dismissed the intentional infliction of emotional distress cause of action, and the judgment in favor of the individual defendants is affirmed.

FACTS AND PROCEDURE

*First Amended Complaint*

Yau's original complaint was amended before the trial court ruled on a pending demurrer. Accordingly, we begin with the allegations of his first amended complaint.

In 1992, Yau was hired as a mechanic by Santa Margarita Ford. By September 2007, he had been promoted to the position of service manager. Yau alleged he was terminated in February 2009 after complaining to Santa Margarita Ford's general manager, Mike Mamic, and later to Santa Margarita Ford's owner, James Graham, that fraudulent warranty repair claims were being submitted to Ford. Yau alleged Santa Margarita Ford's service director, Robert Selff, to whom Yau reported, was the instigator/mastermind of the warranty fraud. He alleged Santa Margarita Ford's parts

2

director, Robert Cira, and its customer relations manager, Gina Allen, were involved as well. Mamic, Graham, Selff, Cira, and Allen were named defendants in Yau's action (and are hereafter referred to collectively as the Individual Defendants).

Yau's first amended complaint described the fictitious warranty repair scheme as follows. Pablo Prudencio was an outside vendor who had previously worked for Santa Margarita Ford to whom Yau, at Selff's direction, referred fictitious warranty repairs. Prudencio would contact Pablo Pastrano in Santa Margarita Ford's parts department and order parts for fictitious warranty repairs. Pastrano would charge Ford for the parts but would not give Prudencio any of the parts because the vehicle did not need them. Selff would have the technician/shop team leader documenting the repair order use the correct "warranty labor operations" and "draft[] a corresponding story to reflect the labor operations that were performed." Once the parts were charged out and everything documented, Selff would meet with Cira (parts director), to discuss how much money Santa Margarita Ford was generating in parts from fictitious warranty claims. Anytime the service department or Selff "needed parts for any reason, Selff would tap into the parts 'credit' . . . ." Selff told Yau "every year Santa Margarita Ford would hire an outside company to take inventory of the parts department" and it would always have $25,000 to $50,000 worth of excess parts that were unexplainable.

Yau alleged that in 2007, Mamic bought a used Ford truck that was out of warranty from Santa Margarita Ford for his son. The engine was replaced with one from a truck still under warranty that had been returned to Santa Margarita Ford after the lease expired. Yau refused Mamic's order to warrant the new engine, believing it would be unlawful to do so. Selff later authorized the warranty of the new engine, telling Mamic "it was not a big deal" to do so.

Yau alleged that beginning in December 2007, Selff ordered him to sign Selff's name to warranty repair orders. Yau did so with the understanding "the warranty clerk" would make sure the claims were proper. From April 2008 to June 2008, Yau

3

repeatedly complained to Mamic about "issues" with fictitious repairs with warranty claims involving Prudencio, Pastrano, Selff, and another person, and Yau did not want to get blamed for them. In July 2008, Mamic told Yau he had spoken with Selff and they agreed Yau should sign warranty repair orders himself. Mamic told Yau that Selff said he was happy to let Yau sign warranty repair orders so if there was a warranty audit, "[Yau] would be the fall guy."

In September and October 2008, Yau told Mamic several times there had been an increase in the warranty numbers related to Prudencio, Pastrano, and Selff, and some claims were questionable. Yau was signing the warranty repair orders, and Yau wanted to make sure he was not blamed for questionable orders if Ford performed a warranty audit.

In October 2008, Selff told Yau to call Prudencio and give him the "green light on fictitious repairs in order to generate as much revenue as possible by the end of the month in order to bring Santa Margarita [Ford's] numbers up." Selff told Yau to "offer . . . Prudencio a high percentage of the total monies generated to compensate him for his participation." Yau "decided to bring the matter to Mamic's attention once again." Mamic again told Yau he would speak to Selff.

By November 2008, "Prudencio had written more warranty claims than Selff had expected which raised a red flag with Santa Margarita [Ford's] warranty numbers." Selff indicated to Yau that he did not want to pay Prudencio what they had agreed, and told Yau to discuss it with Prudencio, but "Prudencio would not hear any of it." Selff later told Yau that he and Prudencio had "'worked it out.'"

In December 2008, Selff told Yau to again contact Prudencio and have him "generate more fictitious warranty repair orders. [Yau] reluctantly did what he was told to do out of fear of his continued employment with Santa Margarita [Ford]." But the amount of warranty claims Prudencio generated was so high that Selff decided to only submit half of them to Ford in December 2008 and the other half in January 2009. Yau

4

again complained to Mamic and said he did not want to sign warranty repair orders. Mamic again said he would talk to Selff.

On January 20, 2009, Selff told Yau to have each service adviser generate five fictitious warranty repair orders each containing three concerns and to give those repair orders to certain technicians "to perform the fictitious repairs." After doing so, Yau gave the repair orders to Selff for review. Selff then reduced the number of warranty concerns on each repair order and had everyone change the repair orders accordingly. Selff ordered Yau to have Allen, Santa Margarita Ford's customer relations manager, change customer contact information on the fictitious repair orders in Ford's data banks so the customer would not get a survey from Ford about the claimed warranty service and verify the vehicles had not had warranty concerns during the past six months. Yau alleged Selff did this to bring the warranty repair numbers down. Yau complained to Mamic and said he would not sign warranty repair orders he was generating at Selff's direction.

In January 2009, Yau met with Mamic and Graham (owner of Santa Margarita Ford) and explained what was happening with fictitious warranty repair orders. They said they would look into it. On February 3, Mamic told Yau that Selff had denied any knowledge of fictitious warranty repair claims, but Mamic said he did not believe Selff. Mamic said Selff was going to be fired after being given one last chance "to 'come clean.'"

On February 4, 2009, Mamic and Graham held a meeting with Selff, Cira, Mamic, and Yau. Yau alleged that before the meeting Mamic told him, "'don't bring up the engine'" Selff had warranted for Mamic's son's truck two years earlier. Mamic also told Yau to not say anything about Allen changing Ford's customer contact information on the last set of fictitious warranty repair orders.

The February 4 meeting did not go well for Yau. Selff accused Yau of being the one who was stealing from Ford and Mamic said he and Selff had counseled

5

Yau about the alleged stealing from Ford in early December 2008. Yau was dismayed Selff would blame it all on him. Yau became visibly upset and was calling Selff and Cira liars, and Graham told Yau he had gone too far. Yau alleged that at one point in the meeting, Selff "slipped up" and admitted he had orchestrated the last set of fictitious warranty repair orders. Graham ended the meeting saying he was going to give everyone a second chance and everyone needed to work together to get "'our hands around the [imminent] warranty audit.'"

On February 11, 2009, Yau was asked to report to Graham's office and as he walked though the showroom, he observed "about six Orange County Deputy Sheriffs" watching him. Graham and Santa Margarita Ford's business manager told Yau he was being terminated for alleged warranty fraud. Mamic was not present. Later, when Yau was in his office gathering his personal belongings, Mamic appeared and said he had just heard about Yau's termination and it had been orchestrated by Selff. Yau later learned it was Mamic who authorized having uniformed officers visibly present in the lobby when Yau was fired. Yau was humiliated by the presence of the officers who kept Yau under close surveillance "for all to see" while he left the property.

Based on the foregoing allegations, Yau's first amended complaint contained a cause of action for wrongful termination in violation of public policy against Santa Margarita Ford. He alleged his termination violated a fundamental public policy embodied by Penal Code section 182, which defines the crime of conspiracy. His complaint also contained a cause of action against the Individual Defendants for intentional infliction of emotional distress.

The trial court sustained Santa Margarita Ford and the Individual Defendants' demurrer to the first amended complaint, with leave to amend. It found Yau had failed to allege a violation of a public policy and had not alleged a nexus between his termination and the alleged public policy violation. It also found Yau failed to allege any extreme and outrageous conduct on the part of the Individual Defendants.

6

Yau's second amended complaint contained the same basic factual allegations as the first amended complaint with a few additions. Yau alleged that when he first told Mamic about fictitious warranty claims, he also told Mamic "that he was not willing to participate in the conspiracy to make fictitious warranty claims." Yau alleged that when Selff directed him to have Allen change customer contact information in Ford's data base, Yau "simply told [her] to speak to Selff about the changes he wanted."

As it relates to Yau's intentional infliction of emotional distress cause of action, he added the following to his factual allegations. At the February 4, 2009, meeting, "Graham angrily pointed his finger at [Yau] and falsely accused him of going too far . . . ." When Yau saw uniformed officers in the lobby when he was summoned to Graham's office on February 11, "[Yau], who was in shock to see the sheriff s watching him, felt scared, weak, his heart was pumping, he felt light-headed, didn't feel like himself and [was] numb. One sheriff had his hand on his weapon and stared at [Yau] the whole time like [Yau] was a dangerous criminal."

Yau's wrongful termination cause of action added allegations that filing fictitious warranty claims to cheat and defraud Ford was criminal conduct and falsely causing another to be arrested for a crime violated criminal laws. Yau also referenced Labor Code section 1102.5, subdivision (c), which prohibits an employer from retaliating against an employee who refuses to participate in an activity that would result in a violation of law.

Yau's intentional infliction of emotional distress cause of action against the Individual Defendants added allegations that the Individual Defendants were at all times acting in the course and scope of their employment. The Individual Defendants attempted to cover-up their own criminal conduct by falsely accusing Yau "and/or continuing to insist [he] participate in the warranty fraud by ordering him to sign the warranty repair orders in order to implicate him in the criminal conspiracy, knowing full

7

well" he did not want to participate. Yau alleged the Individual Defendants' "conduct was intentional and malicious and done for the purpose of causing [Yau] to suffer humiliation, mental anguish, and emotional and physical distress." Yau alleged as a result of the Individual Defendants' conduct, "[he] suffered humiliation, mental anguish, and emotional distress, and has been injured in his mind as follows: [he] felt ashamed, abandoned, distraught, angry, numb, anxious, could not think straight, his world had come to an end, he could not eat and lost weight, sleepless nights, concern that he might be arrested and jailed, [and his] family was upset . . . ."

The trial court sustained the demurrer to the second amended complaint. As to the wrongful termination cause of action, the court noted Yau had still failed to plead facts showing a nexus between the protected activity—Yau's refusal to sign any more fraudulent warranty repair orders—and his termination. The court gave Yau leave to amend this cause of action. As to the intentional infliction of emotional distress cause of action against the Individual Defendants, the court found Yau had still failed to allege any extreme and outrageous conduct on the part of the Individual Defendants. It denied leave to amend the intentional infliction of emotional distress cause of action.

*Third Amended Complaint*

Yau's third amended complaint largely repeated his allegations about the Individual Defendants but omitted most allegations concerning his participation in signing and submitting warranty claims. Yau added allegations he was of Chinese and Native American Indian ancestry and all of the Individual Defendants where Caucasian. At the time he was fired, he was 46 years old and the other Individual Defendants were under the age of 40. Yau alleged that when he was hired in 1997, Mamic asked, "'What kind of name is Yau?'" forcing Yau to reveal his ancestry. He alleged employees at Santa Margarita Ford made demeaning comments, including that Allen referred to a "Mexican person [as] a 'beaner'" and Santa Margarita Ford did not reprimand such conduct.

8

Yau alleged that when Mamic tried to get Yau to participate in signing warranty repair orders, he informed Mamic "he was not willing to participate in the conspiracy." Yau alleged he repeatedly reported the questionable warranty claims to Mamic and "attempted to avoid having to sign any warranty orders . . . ." Yau alleged he "informed [Mamic] that he would not participate in the procedure in any way, because of his concerns that the conduct that Selff was promoting was fraudulent." Yau "refused to be involved in any way, and directed all questions to him, over to [Selff] or [Mamic]."

Yau alleged that in January 2009, he warned Selff "if he did not stop the illegal conduct [Yau] would make a report of his own to the necessary enforcement agency." When Selff ordered Yau to generate five fictitious warranty repair orders each containing three warranty concerns, Yau refused. Selff's direction to Yau to have Allen access Ford's data banks to change Ford consumer contact information so as to avoid receiving a survey violated Santa Margarita Ford's right to access proprietary information of the consumer and constituted an unfair business practice.

Yau's third amended complaint alleged that when Yau was summoned to Graham's office on February 11, 2009, Santa Margarita Ford's business manager, who was Caucasian, was present. Santa Margarita Ford did not conduct any investigation prior to firing Yau and "merely chose to terminate [him] due to his national origin and race. [Yau] was the only non-white person who was alleged to have been involved in the warranty fraud. All of the managing agents who were involved were Caucasian and their employment was not terminated."

Yau alleged his termination violated the public policy set forth in Government Code section 12940, which prohibits discrimination based on national origin, ancestry, or age. He alleged it violated public policy set forth in laws prohibiting criminal conspiracy (Pen. Code, § 182), retaliation for refusing to participate in illegal activity (Lab. Code, § 1102.5), engaging in unfair business practices (Bus. & Prof. Code, § 17200), theft (Pen. Code, § 484), fraud and deceit (Civ. Code, §§ 1572, 1709), and

9

various state and federal laws protecting consumer information. Yau alleged the Individual Defendants' warranty fraud harmed Ford, which paid Santa Margarita Ford for unnecessary parts and repairs that were never made. He also alleged the fraud harmed customers whose personal information was altered.

The trial court sustained Santa Margarita Ford's demurrer to the third amended complaint without leave to amend. It took judicial notice of the allegations in Yau's prior pleadings that he had participated in the warranty fraud. It found Yau had failed to identify a public policy that was violated by his termination because the policies and statutes he cited did not inure to the benefit of the public.

On November 19, 2012, the trial court entered a judgment for the Individual Defendants, and on March 14, 2013, it entered a separate judgment for Santa Margarita Ford, dismissing Yau's complaint. Yau filed separate appeals from the judgments, which we ordered consolidated.

DISCUSSION

A. *Standard of Review on Demurrer*

Our standard of review is well established. We review an order sustaining a demurrer by exercising our independent judgment to determine whether a cause of action has been stated under any legal theory. (*Ochs v. PacifiCare of California* (2004) 115 Cal.App.4th 782, 788.) We must accept as true properly pleaded allegations of fact but not contentions, deductions, or conclusions of fact or law. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) "The burden is on [appellant] to demonstrate the manner in which the complaint might be amended, and the appellate court must affirm the judgment if it is correct on any theory. [Citations.]" (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 459-460.)

B. *Wrongful Termination in Violation of Public Policy*

Yau contends he adequately pleaded a cause of action for wrongful termination in violation of public policy against Santa Margarita Ford. We agree.

10

The elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge caused the plaintiff harm. (*Haney v. Aramark Uniform Services*, *Inc*. (2004) 121 Cal.App.4th 623, 641 (*Haney*).) At issue here is whether Yau adequately pleaded the third element—that the substantial motivation for his termination violates a public policy.

The general legal principles governing Yau's wrongful termination claim are set forth in this court's opinion in *Casella v. SouthWest Dealer Services, Inc.* (2007) 157 Cal.App.4th 1127 (*Casella*). "'[W]hile an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy. Any other conclusion would sanction lawlessness, which courts by their very nature are bound to oppose.' [Citations.] In *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 172 [(*Tameny*)] . . . , the California Supreme Court held that 'at-will employees may recover tort damages from their employers if they can show they were discharged in contravention of fundamental public policy.' [Citation.]" (*Casella, supra,* 157 Cal.App.4th at pp. 1138-1139.)

"In *Gantt v. Sentry Insurance* [(1992)] 1 Cal.4th 1083 [overruled on another point in *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80, fn. 6] . . . the Supreme Court described 'four categories of employee conduct subject to protection under a claim of wrongful discharge in violation of fundamental public policy: "(1) refusing to violate a statute [citations]; (2) performing a statutory obligation [citation]; (3) exercising a statutory right or privilege [citation]; and (4) reporting an alleged violation of a statute of public importance [citations]."' [Citation.] The Supreme Court cautioned that 'courts in *wrongful discharge actions* may not declare public policy without a basis in either constitutional or statutory provisions. A public policy exception

11

carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law.' [Citations.]" (*Casella, supra,* 157 Cal.App.4th at p. 1139.)

"With regard to the requisite policy underlying a wrongful termination in violation of public policy claim, the Supreme Court 'established a set of requirements that a policy must satisfy to support a tortious discharge claim. First, the policy must be supported by either constitutional or statutory provisions. Second, the policy must be "public" in the sense that it "inures to the benefit of the public" rather than serving merely the interests of the individual. Third, the policy must have been articulated at the time of the discharge. Fourth, the policy must be "fundamental" and "substantial."' [Citation.] [¶] 'Whether the policy upon which a wrongful termination claim is based is sufficiently fundamental, well-established and tethered to a statutory or constitutional provision to support liability is a legal question that we review de novo.' [Citation.]" (*Casella, supra,* 157 Cal.App.4th at pp. 1139-1140; *Carter v. Escondido Union High School Dist.* (2007) 148 Cal.App.4th 922, 929 [whether plaintiff's conduct is legally protected activity sufficient to support liability for claim of wrongful termination in violation of public policy is a question of law]; see also Directions for Use to CACI No. 2430 [trial court determines whether purported reason for firing amounts to violation of public policy].)

Yau contends his third amended complaint adequately alleged a public policy tethered to a statutory provision. We agree. In particular, Yau's third amended complaint alleges he was terminated because he complained to his superiors that his supervisor and coworkers were submitting fraudulent warranty claims to Ford. Such

12

conduct, if true, implicates statutes proscribing theft (Pen. Code, §§ 484, 487) and fraud (Civ. Code, §§ 1572, 1709).

*Casella, supra,* 157 Cal.App.4th 1127 is instructive. In *Casella*, plaintiff was a sales representative for a company that sold aftermarket car products to car dealerships. He reported to his superiors suspicions that one of those dealerships was engaged in possibly illegal "'payment packing'" a practice in which dealership customers were quoted an inflated monthly payment for cars in order to mask the true cost of aftermarket products. (*Id.* at p. 1133.) Shortly thereafter, he was fired. (*Id.* at p. 1134.) This court rejected the employer's claim "the public policy at issue was not tethered to a constitutional or statutory provision." (*Id.* at p. 1138.) "This conduct . . . certainly falls within the prohibition of Penal Code section 487 which proscribes making false or fraudulent representation or pretense to defraud another of money. The public policy underlying [the plaintiff's] claim, therefore, is sufficiently tethered to statutory authority." (*Casella, supra,* 157 Cal.App.4th at p. 1138.)

Similarly, in *Haney, supra,* 121 Cal.App.4th 623, an employee's allegations his employment was terminated after objecting to the employer's "practice of overcharging and misleading customers, and [his] refus[al] to follow [the employer]'s practice of defrauding [customers]" implicated public policy tethered to Penal Code section 484 (theft). (*Haney, supra,* 121 Cal.App.4th at pp. 641-642.)

Santa Margarita Ford argues, and the trial court agreed, that Yau's third amended complaint failed to allege violation of a policy that was "'"public" in the sense that it "inures to the benefit of the public" rather than serving merely the interests of the individual.'" (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 272.) The gist of Yau's complaint is he was terminated for having reported to his superiors (the owner and the general manager of Santa Margarita Ford), that fraudulent warranty repair claims were being submitted to Ford. Santa Margarita Ford argues this alleged conduct affects only the private interests of Santa Margarita Ford vis à vis Ford—and it is not conduct

13

affecting "society at large." The trial court agreed commenting "[t]he fact that a private business [Ford] has one of its franchise dealers playing fast and loose with warranty repair costs . . . it's not a matter of public concern."

Santa Margarita Ford relies on *American Computer Corp. v. Superior Court* (1989) 213 Cal.App.3d 664 (*American Computer*), for the proposition a claim for wrongful termination cannot be based on allegations of an employee's complaints to his employer about workplace criminal activity unless the report implicates a significant public interest going beyond the employer's private interest. In *American Computer*, plaintiff's termination followed his reporting suspicions about possible embezzlement by his predecessor. (*Id.* at p. 666.) In ruling the alleged facts did not support a wrongful termination in violation of public policy cause of action, the court concluded plaintiff's reports served the employer's interests, but not the public's. "The most that can connect [plaintiff's] conduct with the public interest is the argument that by reporting his suspicions to his superiors he took action which might eventually prevent or uncover commission of a felony and thereby served the laudable goal of preventing crime. However, the potential for such a public benefit is not a public interest which is weighty enough to give rise to a claim for wrongful discharge." (*Id.* at p. 668.) In short, *American Computer* concluded an employee's report to company officers of suspected theft *from the company* by another employee, which theft does not itself implicate any other public policy considerations, does not support a claim for wrongful termination in violation of public policy.

But *American Computer* has been criticized by subsequent cases. *Collier v. Superior Court* (1991) 228 Cal.App.3d 1117 (*Collier*), is instructive. In *Collier*, plaintiff alleged he was terminated after he reported to his record company employer certain vice presidents were diverting records distributed for free for promotional purposes and selling them on the side for personal profit. The court concluded plaintiff's reporting possible illegal conduct by coworkers, which included possibly violating laws against

14

bribery, kickbacks, embezzlement, tax evasion, drug trafficking, and money laundering was actionable because it "served not only the interests of his employer, but also the public interest in deterring crime and, as we next discuss, the interests of innocent persons who stood to suffer specific harm from the suspected illegal conduct." (*Id.* at p. 1123.) The court observed there is a "fundamental public interest in a workplace free from illegal practices . . . ." (*Id.* at p. 1124.) "[T]he public interest is in a lawful, not criminal, business operation. Attainment of this objective requires that an employee be free to call his or her employer's attention to illegal practices, so that the employer may prevent crimes from being committed by misuse of its products by its employees. [Citation.]" (*Id.* at p. 1125.)

*Collier* discussed and rejected the reasoning of *American Computer.* It first distinguished *American Computer* factually. The victim of the alleged misconduct in *American Computer* was the employer itself, whereas the claimed illegal conduct in *Collier* "affected members of the public including recording artists, record retailers, and tax authorities, as well as the employer." (*Collier*, *supra,* 228 Cal.App.3d at p. 1126.)

*Collier* then went on to cast doubt on the continued viability of *American Computer's* reasoning. It observed, "[t]he court in *American Computer* focused on the absence of the employer's attempt to coerce the employee to engage in criminal conduct and the absence of a direct violation of a statute protecting the employee's rights. [Citation.]" (*Collier*, *supra,* 228 Cal.App.3d at p. 1126.) However, as *Collier* observed, the year after *American Computer* was decided, the California Supreme Court in *Rojo v. Kliger* (1990) 52 Cal.3d 65, 91 (*Rojo*), "rejected a similar argument in the context of a wrongful discharge action based on sex discrimination." (*Collier*, *supra,* 228 Cal.App.3d at p. 1126.) *Rojo* rejected the argument that *Tameny* claims were "limited to situations where the employer coerces an employee to commit an act that violates public policy, or restrains an employee from exercising a fundamental right, privilege or obligation[,]" and held "'[t]o the contrary, the cases strongly imply that

15

an action for wrongful discharge will lie when, as here, the basis of the discharge contravenes a fundamental public policy.' (*Rojo*[,] *supra*, 52 Cal.3d at p. 91.)" (*Collier*, *supra,* 228 Cal.App.3d at p. 1126.)

*Franklin v. The Monadnock Co.* (2007) 151 Cal.App.4th 252 (*Franklin*), similarly rejected the reasoning of *American Computer*. In *Franklin*, plaintiff alleged he was fired after reporting to his employer that a coworker had threatened to kill plaintiff and three other employees. (*Id.* at p. 255.) The *Franklin* court found the complaint adequately alleged a public policy requiring employers to provide a safe and secure workplace and to encourage employees to report credible threats of workplace violence tethered to numerous statutory provisions. (*Id.* at pp. 258-263.) *Franklin* rejected defendants' contention plaintiff's reports did not benefit the public but instead benefitted only plaintiff and his three coworkers. To the contrary, the reports "served the public interest in promoting workplace safety, the interest in deterring workplace crime, and the interests of innocent coworkers who could have suffered harm. Thus, plaintiff's conduct inured to the benefit of the public." (*Id.* at p. 263.) *Franklin* rejected defendant's reliance on *American Computer*, for the reasons articulated in *Collier,* noting one of the primary bases for *American Computer's* reasoning the "'absence of the employer's attempt to coerce an employee to engage in criminal conduct . . . is no longer tenable in light of . . . [*Rojo, supra,* 52 Cal.3d 65 . . . .]' [Citation.]" (*Franklin, supra,* 151 Cal.App.4th at p. 265.)

Like *Collier, supra,* 228 Cal.App.3d 117, and *Franklin, supra,* 151 Cal.App.4th 252, we similarly decline to follow the reasoning of *American Computer*. *American Computer* is factually distinguishable from the present case because unlike *American Computer,* in which the alleged embezzlement was of the employer's own property, here a third party, Ford, was potentially harmed. More importantly, Yau's allegations he was terminated due to his complaints to his employer about alleged warranty fraud being perpetrated by coworkers served not only the interests

16

of his employer but also served the "fundamental public interest in a workplace free from crime . . . ." (*Collier*, *supra,* 228 Cal.App.3d at p. 1127.) To the extent Santa Margarita Ford argues Yau's allegations were not of "public" importance because they implicated only a contractual relationship between Santa Margarita Ford and its franchisor, Ford, we disagree. (See *Haney, supra,* 121 Cal.App.4th at p. 643, fn. 15 [an employee discharged for complaining about employer's breaches of contract may not state claim for wrongful discharge in violation of public policy].) Even if Yau's allegations could be construed as complaints about breaches of Santa Margarita Ford's contracts or franchise agreements with Ford, they also encompass potential violations of statutes proscribing theft (Pen. Code, §§ 484, 487) and fraud (Civ. Code, §§ 1572, 1709).

Santa Margarita Ford also argues Yau's wrongful termination claim fails because he did not allege a nexus between his firing and his allegedly protected activity. (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1258.) It argues Yau's admissions in his prior pleadings he was "involv[ed] in the fraudulent warranty activities he allegedly reported to Santa Margarita [Ford's] management[,]" provided Santa Margarita Ford with ample grounds to fire him. Moreover, Santa Margarita Ford argues because it was within its "discretion to terminate Yau based upon his admitted involvement in the alleged warranty fraud . . . he could not state a wrongful termination claim because no public policy was violated."

We reject Santa Margarita Ford's contention. The third amended complaint may reasonably be interpreted as alleging Yau at first reluctantly complied with directions from his immediate supervisor, Selff, to sign warranty claims he believed were suspicious because he feared for his job. But Yau repeatedly raised concerns with the general manager about the propriety of the warranty claims. He eventually refused to sign any more suspicious warranty claims and demanded a meeting with owner, following which he was fired. (See *Haney*, *supra*, 121 Cal.App.4th at p. 643 ["when an employer discharges an employee who refuses to defraud a customer, the employer has

17

violated a fundamental public policy and may be liable in tort for wrongful discharge"].) Although Yau may well be unable to prove his termination resulted from complaining about alleged warranty fraud and refusing to participate, as opposed to being fired because of his participation, we cannot say he has not alleged a nexus sufficient to survive demurrer. In sum, Yau adequately alleged his wrongful termination in violation of public policy cause of action tethered to statutes proscribing theft and fraud.

Yau in passing argues he adequately alleged his termination violated the public policy embodied in the California Fair Employment and Housing Act (Gov. Code, § 12900) on the grounds he was fired because of his age (over 46) and his national origin and ethnicity (Chinese and Native American). His third amended complaint alleged the employees involved in the warranty fraud, none of whom were fired, were all Caucasian and under age 40. Although "FEHA's provisions prohibiting discrimination may provide the policy basis for a claim for wrongful discharge in violation of public policy[]" (*Phillips v. St. Mary Regional Medical Center* (2002) 96 Cal.App.4th 218, 227, fn. omitted), because we conclude Yau adequately alleged his termination violated public policy tethered to statutes proscribing theft and fraud, we need not decide if the FEHA policy applies as well.[1] Nor need we consider the laundry list of other statutes Yau cites as supplying that policy. [2]

[1] To the extent Yau's addition of age and national origin discrimination allegations to his third amended complaint can be construed as an attempt at stating a separate FEHA cause of action, we agree with Santa Margarita Ford the attempt fails. Yau did not obtain leave to amend his complaint to state a new cause of action. (*Harris v. Wachovia Mortg., FSB* (2010) 185 Cal.App.4th 1018, 1023 ["plaintiff may not amend the complaint to add a new cause of action without having obtained permission to do so, unless the new cause of action is within the scope of the order granting leave to amend"].) Additionally, any attempt to state such a cause of action would be barred by Yau's failure to exhaust his administrative remedies. (*Rojo, supra,* 52 Cal.3d at p. 83; *Okoli v. Lockheed Technical Operations Co.* (1995) 36 Cal.App.4th 1607, 1612.)

[2] Yau refers to the criminal conspiracy statute (Pen. Code, § 182), Labor Code section 1102.5, subdivision (c) [prohibiting employer's retaliation for employee's

18

*C. Intentional Infliction of Emotional Distress*

Yau contends he adequately alleged a cause of action for intentional infliction of emotional distress. We conclude the trial court did not abuse its discretion by sustaining the demurrer as to this cause of action without leave to amend.

"'"'[T]o state a cause of action for intentional infliction of emotional distress a plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.'" [Citations.] '"Conduct, to be '"outrageous"' must be so extreme as to exceed all bounds of that usually tolerated in a civilized society.'" [Citation.] In order to avoid a demurrer, the plaintiff must allege with 'great[ ] specificity' the acts which he or she believes are so extreme as to exceed all bounds of that usually tolerated in a civilized community. [Citation.]" (*Vasquez v. Franklin Management Real Estate Fund, Inc.* (2013) 222 Cal.App.4th 819, 832 (*Vasquez*).)

Yau's intentional infliction of emotional distress cause of action was alleged only as to the Individual Defendants. On appeal, they and Santa Margarita Ford argue the cause of action is barred by the exclusivity provisions of the Workers' Compensation Act (Lab. Code, § 3600 et seq.). They are correct.

Physical and emotional injuries sustained in the course of employment are pre-empted by the workers' compensation scheme and generally will not support an independent cause of action. (*Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 160 (*Cole*).) Emotional injuries caused by workplace discipline, including

---

refusal to participate in fraudulent activity], Business and Professions Code section 17200, et seq. [unfair business practices], and 15 U.S.C. sections 6801-6809, and 6821-6827 concerning unauthorized access to consumer information, but he offers no analysis of any of those statutes or how they provide the requisite public policy.

19

termination, fall within this rule.  (*Ibid.*; see also *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 7.)  As noted in *Cole*, *supra,* 43 Cal.3d at page 160, "when the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances, an employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code by characterizing the employer's decisions as manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance resulting in disability."

Yau relies on a series of cases that have found exceptions to this general rule of preemption when the intentional infliction of emotional distress claim is based on conduct that violates a fundamental public policy.  (See e.g., *Cabesuela v. Browning-Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101, *Leibert v. Transworld Systems, Inc.* (1995) 32 Cal.App.4th 1693; *Phillips v. Gemini Moving Specialists* (1998) 63 Cal.App.4th 563.)  Those cases were decided before our Supreme Court's decision in *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876 (*Miklosy*), which held the exception to workers' compensation preemption for employer "conduct that 'contravenes fundamental public policy' is aimed at permitting a *Tameny* action [for wrongful discharge in violation of public policy] to proceed despite the workers' compensation exclusive remedy rule."  (*Id.* at pp. 902-903.)  This exception does not, however, allow a "distinct cause of action, not dependent upon the violation of an express statute or violation of fundamental public policy."  (*Id.* at p. 902.)  *Miklosy* held that even "'severe emotional distress'" arising from "'outrageous conduct'" that occurred "at the worksite, in the normal course of the employer-employee relationship" is the type of injury that falls within the exclusive province of workers' compensation. (*Ibid.*)  "'An employer's intentional misconduct in connection with actions that are a normal part of the employment relationship . . . resulting in emotional injury is considered to be encompassed within the compensation bargain, even if the misconduct

20

could be characterized as "manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance."' [Citation.]" (*Vasquez, supra,* 222 Cal.App.4th at p. 833.) Accordingly, the trial court did not err by sustaining the demurrer as to this cause of action.

## DISPOSITION

The judgment in favor of Respondents Graham, Mamic, Cira, Allen, and Selff is affirmed. The judgment in favor of Santa Margarita Ford is reversed and the matter is remanded for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


ARONSON, J.


21