Filed 11/25/14  Valentine v. GEP Cencast CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MAX VALENTINE, | B251737 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC488251) |
| v. | |
| GEP CENCAST, LLC, dba CENTRAL CASTING, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles, Mark V. Mooney, Judge.  Affirmed.

Law Offices of Nevin Kamath and Nevin Kamath for Plaintiff and Appellant.

Fisher & Phillips, John M. Polson, Steven A. Witt, for Defendant and Respondent.

_____

Plaintiff and appellant Max Valentine appeals from a judgment of dismissal entered after the court sustained without leave to amend the demurrer of defendant and respondent GEP Cencast, LLC, doing business as Central Casting, to Valentine's second amended complaint, finding that all causes of action were preempted by the National Labor Relations Act (NLRA) (29 U.S.C. § 151 et seq.).  Valentine contends the preemption finding was erroneous and the court abused its discretion in denying leave to amend.  We conclude that the court erred in sustaining the demurrer on preemption grounds.  We nonetheless affirm the judgment because Valentine has failed to adequately plead any cause of action and has not proposed amendments that would cure the defects in his complaint.

## FACTUAL AND PROCEDURAL BACKGROUND

Acting in propria persona, Valentine filed a form complaint against Central Casting on July 16, 2012.  Central Casting demurred, and Valentine filed an amended complaint.  The amended complaint alleged that Central Casting unlawfully favored actors who paid additional fees or kickbacks, and that Central Casting colluded with the Screen Actors Guild (SAG) and American Federation of Television and Radio Artists (AFTRA) to force union members to pay for work opportunities.  Central Casting again demurred, arguing that the causes of action were preempted under the NLRA, and alternatively, that each claim failed to state a cause of action.  On May 14, 2013, the court sustained the demurrer with leave to amend and ordered that "[n]o new causes of action and no new parties are to be added without leave of court."

Valentine filed the operative second amended complaint on June 3, 2013, alleging causes of action for unfair business practices in violation of Business and Professions Code section 17200 et seq., wrongful termination/retaliation for whistleblowing, and

intentional infliction of emotional distress.[1]  Central Casting again demurred, arguing preemption and the failure to state a cause of action.  After considering argument from both parties, the court sustained the demurrer without leave to amend, stating, "The Court finds the causes of action are pre-empted by NLRA."

Valentine and Central Casting portray the gravamen of Valentine's claims differently.  In his opening brief, Valentine claims his lawsuit rests on allegations that Central Casting "denied him work because he refused to pay bribes, deceptively marketed services run by ex-Central Casting managers that were supposed to lead to more work but did not, and misrepresented to Valentine that if he volunteered his time for unpaid acting jobs he would be rewarded with paying jobs.  Then, when Valentine complained about these unlawful business practices, Central Casting fired him."  Central Casting, on the other hand, characterizes Valentine's suit as "revolv[ing] around Central Casting's alleged unlawful scheme to:  collude with actors' unions; violate collective bargaining agreements; force union members to pay 'kick-backs' and discriminatory additional fees; provide favorable treatment to certain union members, and discriminate against and target others; force union members to accept non-union pay; purposely cause union members to lose their benefits eligibility under a collective bargaining agreement; and 'black ball' and/or terminate union members for complaining of this scheme to management or their union and for seeking union intervention."

Our own reading of the complaint reveals the following relevant allegations:  Valentine is a member of the SAG and AFTRA unions, but neither union has an agreement with Central Casting.  When selecting actors for background acting jobs, Central Casting favored actors who paid additional fees to third party call-in services, as well as a core group of actors—some of whom were not union members—who paid bribes or kickbacks to Central Casting employees.  Central Casting charged union members a $25 registration fee and a $10 imaging fee to register with the company.

---

[1] Valentine dismissed a cause of action for negligent supervision and retention on July 19, 2013.

Every couple of years, Central Casting would delete the files of individuals who had already registered, requiring them to pay additional fees to re-register. When union members who did not use the call-in service did obtain work, they would be paid minimum wage rather than union scale, and if they resisted the practice, they would be blacklisted in the industry. If an actor objected to Central Casting's practices, he or she would be blacklisted. If an actor stopped using the third party call-in services or stopped paying kickbacks, he or she would receive less work through Central Casting, or no work at all. When Valentine refused to participate in the call-in services or other aspects of Central Casting's scheme, Central Casting withheld him from consideration for the most lucrative or crucial jobs. His inability to obtain work through Central Casting caused him to lose his union benefits. He complained to defendant and Central Casting employees and to union leadership, but the practices continued. Valentine received a termination notice in July 2010, allegedly in retaliation for his refusal to participate in Central Casting's "unlawful scheme," for complaining about the scheme, and for his attempts to seek union mediation.

## DISCUSSION

Valentine contends the trial court erred in finding the complaint preempted. He further contends he has adequately stated valid causes of action and the court abused its discretion in denying leave to amend.

## Preemption

Valentine contends on appeal the trial court erred in finding his complaint preempted because the activity which forms the basis of his state law claims is neither arguably protected nor arguably prohibited under the NLRA. We agree. "[W]hether an action is preempted by federal law is a question the appellate court reviews de novo. [Citation.]" (*Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807,

4

1812.)  We keep in mind that "[a] plaintiff may not avoid a demurrer by pleading facts or positions in an amended complaint that contradict the facts pleaded in the original complaint or by suppressing facts which prove the pleaded facts false.  [Citation.] Likewise, the plaintiff may not plead facts that contradict the facts or positions that the plaintiff pleaded in earlier actions or suppress facts that prove the pleaded facts false. [Citation.]"  (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 877, italics omitted.)

Under the supremacy clause of the United States Constitution, federal law preempts state law.  (U.S. Const., art. VI, § 2.)  If a federal law does not include an express preemption provision, courts will uphold a state or local law "'unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.'  [Citation.]"  (*Allis–Chalmers Corp. v. Lueck* (1985) 471 U.S. 202, 209.)

The NLRA does not contain an express preemption provision, but the United States Supreme Court has "held that Congress implicitly mandated two types of pre-emption as necessary to implement federal labor policy.  The first, known as *Garmon* pre-emption . . . [(*San Diego Building Trades Council, etc. v. Garmon* (1959) 359 U.S. 236 (*Garmon*))], 'is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the "integrated scheme of regulation" established by the NLRA.'  [Citation.]  To this end, *Garmon* pre-emption forbids States to 'regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.'  [Citation.]  The second, known as *Machinists* pre-emption, forbids both the National Labor Relations Board (NLRB) and States to regulate conduct that Congress intended 'be unregulated because left "to be controlled by the free play of economic forces."'  [(*Lodge 76, International Association of Machinists and Aerospace Workers, AFL–CIO v. Wisconsin Emp. Rels. Comm'n* (1976) 427 U.S. 132, 140 (*Machinists*).)]"  (*Chamber of Commerce of United States v. Brown* (2008) 554 U.S. 60, 65.)

In cases involving *Garmon* preemption, state courts "must defer to the exclusive competence of the National Labor Relations Board in cases in which the activity that is

5

the subject matter of the litigation is arguably subject to the protections of [section] 7 or the prohibitions of [section] 8 of the [NLRA]." (*Linn v. Plant Guard Workers* (1966) 383 U.S. 53, 60.)  "The United States Supreme Court has addressed what 'arguable' means in the context of questions of law and questions of fact.  As to questions of law, the party asserting preemption must advance a statutory construction of the NLRA 'that is not plainly contrary to its language and that has not been "authoritatively rejected" by the courts or the [NLRB].  [Citation.]'  [Citation.]  As to questions of fact, the 'party must then put forth enough evidence to enable the court to find that the [NLRB] reasonably could uphold a claim based on such an interpretation.'  [Citation.]" (*Haney v. Aramark* (2004) 121 Cal.App.4th 623, 633-634 (*Haney*).)

To the extent the party seeking preemption contends an activity is "arguably prohibited" under section 8, the United States Supreme Court has cautioned against applying the doctrine of *Garmon* preemption in a mechanical fashion, when the state has a "substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme." (*Farmer v. United Brotherhood of Carpenters & Joiners* (1977) 430 U.S. 290, 302*; Sears, Roebuck & Co. v. Carpenters* (1978) 436 U.S. 180, 188 (*Sears*).)  Courts must examine "not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been but was not, presented to the [NLRB]." (*Sears, supra*, at p. 197.)  State law claims are not preempted if their adjudication creates "no realistic risk of interference with the [NLRB's] primary jurisdiction to enforce the statutory prohibition against unfair labor practices." (*Id.* at p. 198.)


1. Protected Activity


Section 7 of the NLRA protects employees' rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their

6

own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." (29 U.S.C. § 157.)

Activity by a single employee can be considered concerted activity subject to protection under section 7 if it meets an "objective test requiring some linkage to group action . . . ." (*Haney, supra,* 121 Cal.App.4th at p. 635, quoting *Ewing v. N.L.R.B.* (2d Cir. 1988) 861 F.2d 353, 355 (*Ewing*).) The linkage or nexus requirement can be met three different ways. First, the individual's act can be based on prior concerted activity. "For example, a single employee's invocation of rights set forth in a [collective bargaining agreement] is presumed to be concerted activity because the [collective bargaining agreement] was put into effect by group action." (*Haney*, *supra*, at p. 635, fn. 5, citing *N.L.R.B. v. City Disposal Systems, Inc.* (1984) 465 U.S. 822, 833 (*City Disposal*).) Second, the linkage or nexus requirement is satisfied "if an individual acts, formally or informally, on behalf of a group." (*Ewing*, 861 F.2d at p. 361.) Third, an individual engages in concerted activity if he or she attempts to bring about or prepare for group action, even if those attempts are unsuccessful in achieving group action. (*Ibid*.)

In its demurrer, Central Casting argued Valentine engaged in "concerted activity" by asserting rights under a collective bargaining agreement. Central Casting relies on *City Disposal*, where a provision of a collective bargaining agreement between the employer and the union stated that the employer would not require employees to drive unsafe trucks. After the employer fired a driver for refusing to drive a truck he honestly and reasonably believed to be unsafe, the court found the driver's individual refusal constituted concerted activity because he was asserting a right grounded in the collective bargaining agreement. (*City Disposal*, *supra*, 465 U.S. at pp. 830-836.) The *City Disposal* court found an individual's assertion of rights rooted in a collective bargaining agreement to be a concerted activity because it is an inseparable part of the process giving rise to the agreement itself. "That process—beginning with the organization of a union, continuing into the negotiation of a collective-bargaining agreement, and extending through the enforcement of the agreement—is a single, collective activity. [Footnote omitted.] Obviously, an employee could not invoke a right grounded in a

7

collective-bargaining agreement were it not for the prior negotiating activities of his fellow employees.  Nor would it make sense for a union to negotiate a collective-bargaining agreement if individual employees could not invoke the rights thereby created against their employer."  (*Id*. at pp. 831-832.)

For Valentine's allegations to amount to concerted activity as described in *City Disposal*, there must be an allegation of a negotiated collective bargaining agreement between Central Casting and a union.  Instead, the complaint alleges the opposite: "defendant Central is not a party to an agreement with any union to which Plaintiff is a member."  In making its preemption argument, Central Casting relied solely on attenuated references to an unidentified collective bargaining agreement, and did not ask the court to take judicial notice of any such agreement.  Unless the trial court took judicial notice of a collective bargaining agreement, it lacked the factual basis necessary to conclude that Valentine was asserting rights under such an agreement, and therefore erred in finding preemption based on *City Disposal*.

In the Respondents' Brief, Central Casting contends Valentine's allegations also meet the third test for concerted activity because he alleges an "attempt[] to bring about or prepare for group action" by seeking assistance and mediation from union leadership.  (*Haney*, 121 Cal.App.4th at p. 635.)  It is true that Valentine cites his "numerous attempts to seek mediation with Central by union leaders" as one of three retaliatory reasons underlying his wrongful termination claim.  Standing alone, such an allegation might support a finding of preemption, but because he also alleges he was terminated for conduct that would not be protected activity under the NLRA, his cause of action for wrongful termination is not preempted.  (See *Balog v. LRJV, Inc.* (1988) 203 Cal.App.3d 1343, 1304 ["so long as defendants' intentional wrongful conduct was motivated by impermissible considerations other than solely a desire or plan to interfere with collective bargaining or unionization, they may be held liable under state law"].)

8

## 2. Prohibited Activity

The allegations of the complaint do not support Central Casting's contention on appeal that Valentine's claims are preempted because they center around activities that were arguably prohibited under section 8 of the NLRA. Under section 8, it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees" in the exercise of their Section 7 rights or to discriminate against employees "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership" in a union. (29 U.S.C. § 158(a)(1) and (a)(3).)

Some of Central Casting's examples mischaracterize Valentine's allegations, attempting to shoehorn the complaint into the mold of section 8 prohibited activity. For example, Central Casting points to an allegation that "Central Casting colluded with actors' unions to develop and run 'a scheme to harm and defraud' union members, forcing them to pay additional monthly fees beyond their CBA dues." Such collusion might be considered arguably prohibited under section 8. (See 29 U.S.C. § 158(a)(3).) However, the singular reference in the complaint to collusion only secondarily implicates the unions, and does not establish that the alleged "collusion" operated to encourage or discourage membership in a union: "Central operates in collusion with the Studios and, ultimately, actors unions to coerce/force actors to pay for work and access to work on top of all the aforementioned fees/dues[.]" Because the alleged collusion affected all actors, regardless of union membership, it is not arguably prohibited activity.

Other examples accurately reflect the allegations of the complaint, but still do not demonstrate activity that is arguably prohibited under section 8. For example, the complaint alleges that a disproportionately high number of union engagements were given to members of a core group, to the detriment of general union members. But the allegation that some members of the core group were union members, while others were not, does not establish that the scheme Valentine complains of discriminated in a manner intended to encourage or discourage union membership.

9

We further agree with Valentine that his claims are not preempted under the *Sears* standard, because his claims regarding Central Casting's practices are not identical to any claims he might present to the NLRB. The three practices that are at the core of Valentine's complaint affect union and non-union employees equally: (1) the preference for actors that use a separate call-in service at an additional charge, (2) the practice of accepting bribes or kickbacks, and (3) the practice of requiring actors to repeatedly pay registration and imaging fees to remain in Central Casting's database. Whether these practices violate state law is a question for the state courts to decide, and Central Casting's arguments do not convince us that a state court decision on the matter would interfere with the jurisdiction of the NLRB.

We therefore conclude, contrary to Central Casting's demurrer and the trial court's ruling, that Valentine's claims are not preempted.

## Sufficiency of the Complaint

Despite the court's error in finding Valentine's complaint preempted, Valentine has not demonstrated that the order sustaining the demurrer without leave to amend merits reversal. Valentine's complaint contains many allegations that are conclusions of law, rather than allegations of fact. Such allegations cannot be relied on to overcome a demurrer. "It is the appellant's burden to affirmatively demonstrate reversible error. [Citation.]" (*California Pines Property Owners Assn. v. Pedotti* (2012) 206 Cal.App.4th 384, 392.) "We affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons. [Citation.]" (*Fremont Indem. Co. v. Fremont General Corp*. (2007) 148 Cal.App.4th 97, 111.) "A demurrer tests the legal sufficiency of factual allegations in a complaint. [Citation.] In reviewing the sufficiency of a complaint against a general demurrer, this court treats the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. This court also considers matters that may be judicially noticed. When a demurrer is sustained, this court determines whether the complaint states facts sufficient to

10

constitute a cause of action.  [Citation.]"  (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 42-43 (*Rakestraw*).)

### 1. Unfair Competition Claim (Bus. & Prof. Code, § 17200)

Business and Professions Code section 17200 defines unfair competition as "any unlawful, unfair or fraudulent business act or practice . . . ."  The Unfair Competition Law (UCL) recognizes "three varieties of unfair competition: practices which are unlawful, unfair or fraudulent."  (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311, internal quotation marks omitted.)  Valentine's allegations are insufficient to state a cause of action under any of the prongs.

#### a. *Unlawful prong of Unfair Competition Law*

To state a cause of action under the UCL's "unlawful" prong, a complaint must state facts sufficient to establish a violation of another law.  (*Berryman v. Merit Property Management, Inc.* (2007) 152 Cal.App.4th 1544, 1554.)  The complaint alleges that Central Casting (1) favored a core group of actors, which is not unlawful in itself, (2) engaged in extortion in violation of Penal Code section 518 by encouraging actors to register with a call-in service that charged a monthly fee, (3) violated Penal Code section 641.3 by soliciting bribes or kickbacks from actors seeking repeated or higher paying acting jobs, and (4) charged registration and imaging fees, while deleting files every couple of years and requiring actors whose files have been deleted to pay additional fees to re-register.  To carry his burden of demonstrating reversible error on appeal, Valentine must demonstrate how these allegations amount to a valid cause of action under the UCL.  He has not done so.

Valentine's complaint does not allege sufficient facts to establish the legal violations he claims to be the basis for his UCL cause of action.  The allegation that a company has extorted payments or accepted bribes to favor certain actors over others is a mere conclusion without any factual support.  Our de novo review of the operative

11

complaint reveals no factual allegations linking the assignment of work to the payment of bribes or unauthorized fees. The complaint even acknowledges that some "[u]nion members, unaffiliated with Central's 'proxy', would 'laboriously' obtain coveted union engagements . . . ." Because the complaint does not allege any contractual or legal provision preventing Central Casting from charging additional fees, it does not allege the elements for extortion or violating federal RICO laws. (See, e.g., *Rothman v. Vedder Park Management* (9th Cir. 1990) 912 F.2d 315, 318 [alerting homeowners of possible consequences of failure to act did not constitute extortion or a RICO violation].) Despite Valentine's protestations to the contrary, monthly fees charged by third parties do not establish that Central Casting violated Labor Code section 1702. Only individual employees can violate Penal Code section 641.3 (commercial bribery) by acting to the detriment of the employer. (See Pen. Code, § 641.3, subd. (a).)

### b. *Unfair prong of Unfair Competition Law*

"A business practice is unfair within the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits. [Citations.]" (*McKell v. Washington Mut., Inc.* (2006) 142 Cal.App.4th 1457, 1473.) In addition, the alleged injury cannot be "an injury the consumers themselves could reasonably have avoided. [Citation.]" (*Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824, 839.) The only injury Valentine alleges is that he was not considered for most lucrative or crucial jobs, and as a result he lost health and pension benefits. Valentine does not allege that he was entitled to or even qualified for those jobs, thus making his injury allegation speculative and conclusory. Also, because Valentine could have reasonably avoided injury either by refraining from paying the objectionable fees or by searching for acting jobs through other means, he has not stated a cause of action under the "unfair" prong of the UCL.

12

c. *Fraudulent prong of Unfair Competition Law*

A plaintiff pursuing a UCL claim under the fraud prong "must allege he or she was motivated to act or refrain from action based on the truth or falsity of a defendant's statement, not merely on the fact it was made." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 327, fn. 10.) In addition, a failure to disclose information does not support a claim under the fraudulent prong of the UCL, unless a duty to disclose exists. (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 614.) Because the complaint does not identify allegedly fraudulent statements or a duty to disclose additional information, Valentine has not stated a cause of action under this prong of the UCL.

## 2. Wrongful Termination

"The elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge caused the plaintiff harm." (*Yau v. Santa Margarita Ford, Inc.* (2014) 229 Cal.App.4th 144, 154, citing *Haney, supra,* 121 Cal.App.4th at p. 641.) The second amended complaint fails to allege the first and most crucial element of a wrongful termination claim: an employer-employee relationship. Instead, it only alleges that "[Valentine] received a termination notice dated July 16, 2010" and does not include a copy of the termination notice. Without more, there is no way to determine whether the notice in fact terminated an employment relationship between Valentine and Central Casting. Even if Valentine alleged he was Central Casting's employee, he has not adequately alleged that Central Casting was substantially motivated by a violation of public policy, because his allegations of unlawful conduct fall short. (See *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1095 ["courts in *wrongful discharge actions* may not declare public policy without a basis in either constitutional or statutory provisions"]; but

13

see *Green v. Ralee Engineering Co* (1998) 19 Cal.4th 66, 71 [expanding the source of public policy to include certain administrative regulations].)  Accordingly, Valentine has not stated a cause of action for wrongful termination in violation of public policy.


      3.  Intentional Infliction of Emotional Distress


To state a claim for intentional infliction of emotional distress, Valentine must allege Central Casting engaged in (1) extreme and outrageous conduct (2) with the intention of causing, or reckless disregard of the probability of causing, emotional distress, and (3) resulting distress.  (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001.)  To be outrageous, the conduct ""must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.""" (*Ibid*.)

Nothing alleged in Valentine's complaint meets the standard of conduct outside the bounds of what is usually tolerated in a civilized community, and therefore, he has not stated a claim for intentional infliction of emotional distress.


**Leave to Amend**


The remaining question is whether the court abused its discretion in denying leave to amend.  "It is an abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable probability that the defect can be cured by amendment.  [Citation.]" (*Siliga v. Mortgage Electronic Registration Systems, Inc.* (2013) 219 Cal.App.4th 75, 81.) "The plaintiff bears the burden of proving there is a reasonable possibility of amendment. [Citation.]  The plaintiff may make this showing for the first time on appeal.  [Citation.]" (*Rakestraw, supra,* 81 Cal.App.4th at p. 43.)  Appellant must demonstrate "'in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.'  [Citation.]  The assertion of an abstract right to amend does not satisfy this burden.  [Citation.]" (*Ibid*.)  "The burden of showing that a reasonable possibility exists that amendment can cure the defects remains with the plaintiff; neither the trial

court nor this court will rewrite a complaint. [Citation.] Where the appellant offers no allegations to support the possibility of amendment and no legal authority showing the viability of new causes of action, there is no basis for finding the trial court abused its discretion when it sustained the demurrer without leave to amend. [Citations.]" (*Id.* at p. 44.)

When asked at oral argument what changes Valentine would make to the complaint, his counsel stated he would eliminate all references to a collective bargaining agreement. Although the opening brief mentions a few additional changes, none of the proposed amendments are sufficient to overcome the deficiencies outlined above. Because Valentine cannot identify what new allegations would salvage his claims, and he has already effectively received two opportunities to amend his complaint, we discern no abuse of discretion in denying leave to amend one more time.

**DISPOSITION**

The judgment is affirmed. The parties are to bear their own costs on appeal

KRIEGLER, J.

We concur:

TURNER, P. J.                    GOODMAN, J. [*]

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.