Filed 9/27/22 Randhawa v. Hanford Community Hospital CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JOGINDER SINGH RANDHAWA, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> HANFORD COMMUNITY HOSPITAL, <br><br> Defendant and Respondent. | F081846 <br><br> (Super. Ct. No. 19C0001) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Kings County. Kathy Ciuffini, Judge.

Lyon Law and Geoffrey C. Lyon for Plaintiff and Appellant.

Seyfarth Shaw and Kiran A. Seldon; Vedder Price and Candice T. Zee for Defendant and Respondent.

-ooOoo-

Plaintiff Joginder Singh Randhawa appeals from a summary judgment entered in favor of defendant Hanford Community Hospital dba Hanford Community Medical Center aka Adventist Health Hanford (AHH). We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Brief Overview

Randhawa was employed by AHH as a microbiologist. On November 20, 2018, AHH terminated Randhawa's employment. According to AHH, Randhawa's employment was terminated for violating privacy and confidentiality policies of AHH, as well as various state and federal laws including the Health Insurance Portability and Accountability Act of 1996 (HIPAA).[1] At the time his employment was terminated, Randhawa was on medical leave for anxiety disorder, stress and other ailments due to an alleged "hostile work environment" created by Randhawa's supervisor and AHH management. His employment was terminated one week before his scheduled return to work from his medical leave.

The termination notice Randhawa received stated, in part: "As you [i.e., Randhawa] are aware, on 08/31/2018, you admitted during your deposition that you copied various medical records and other documents in both paper and electronic format, removed these copied records from [AHH's] premises, and then copied these records and documents onto your home personal computer which is available to other people.[2] You also testified you e-mailed documents containing protected health information [PHI] to yourself.[3]"

---

[1]    42 U.S.C. § 1320d et seq.

[2]    Randhawa was deposed while on medical leave in connection with his claim for workers' compensation benefits.

[3]    The term "protected health information" [i.e., PHI] is defined in part 160.103 of title 45 Code of Federal Regulations. Subject to certain exclusions, PHI generally "means individually identifiable health information" transmitted or maintained in any form or medium. (*Ibid.*) "Individually identifiable health information is information that

Randhawa filed suit against AHH alleging numerous claims of harassment, discrimination, retaliation, and wrongful termination. AHH moved for summary judgment or, in the alternative, summary adjudication of Randhawa's claims. The trial court granted AHH's motion, and summary judgment in favor of AHH and against Randhawa was entered. This appeal followed.

## II.     Procedural Background

On January 3, 2019, after receiving right to sue letters from the Department of Fair Housing and Employment (DFEH) and the U.S. Equal Employment Opportunity Commission (EEOC), Randhawa filed his complaint in this matter alleging 11 causes of action against AHH for (1) whistleblower retaliation (Lab. Code, §§ 1102.5 & 1102.6); (2) disability discrimination (Gov. Code, § 12940, subd. (a)); (3) failure to engage in the interactive process to determine reasonable accommodations for his disability (Gov. Code, § 12940, subd. (n)); (4) failure to reasonably accommodate his disability (Gov. Code, § 12940, subd. (m)); (5) medical leave retaliation (Gov. Code, § 12945.2); (6) medical leave discrimination (Gov. Code, § 12945.2); (7) age discrimination (Gov. Code, § 12940); (8) race discrimination (Gov. Code, § 12940); (9) retaliation for opposing FEHA[4] violations (Gov. Code, § 12900, et seq.; § 12940, subd. (h); (10) failure to prevent discrimination and retaliation (Gov. Code, § 12940, subds. (j) & (k); and (11) wrongful termination in violation of public policy.

---

is a subset of health information, including demographic information collected from an individual, and: [¶] (1) [is] created or received by a health care provider, health plan, employer, or health care clearinghouse; and [¶] (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and [¶] (i) That identifies the individual; or [¶ ] (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual. (*Ibid*.)

**4**      California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.).

On March 13, 2019, AHH answered Randhawa's complaint. AHH generally denied all material allegations of the complaint and asserted 20 affirmative defenses including, without limitation, a statute of limitations defense, and defenses based on AHH's contention that it had a legitimate business reason for taking adverse employment actions against Randhawa, and that it would have made the same decisions regarding those adverse employment actions in the event Randhawa is able to demonstrate a mixed motive for AHH's decisions.

On December 31, 2019, AHH filed a motion for summary judgment or, in the alternative, summary adjudication of each of Randhawa's 11 causes of action and Randhawa's associated claims for punitive damages. On March 9, 2020, AHH requested that its motion be removed from the trial court's calendar due to the inadvertent omission of certain exhibits in support of the motion. On March 11, 2020, AHH refiled its motion. Randhawa filed his opposition on May 12, 2020, and AHH filed its reply on May 20, 2020.

An initial hearing on AHH's motion was held on May 26, 2020, and the trial court took the matter under submission. A further hearing was held on July 23, 2020, after the parties and court agreed to allow further briefing. Randhawa provided supplemental briefing concerning his contention that AHH had a "mixed motive" for terminating Randhawa's employment, and AHH filed a supplemental brief in opposition.

On July 23, 2020, the court adopted its tentative ruling and granted AHH's motion for summary judgment. On September 1, 2020, judgment was entered in AHH's favor and against Randhawa.

Notice of entry of the judgment was filed and served on September 28, 2020. Randhawa timely appealed on October 7, 2020.

## III. Factual Background

Randhawa was hired by AHH in 1997, at age 60, to work as a microbiologist in AHH's microbiology laboratory. At the time of his hiring, Randhawa had close to 20

4.

years' experience as a microbiologist. In February of 2009, Randhawa resigned from AHH to work closer to home. A few months later, Randhawa was rehired by AHH as a part-time employee and, by the end of 2009, had resumed full-time employment with AHH. Randhawa's employment was at-will.

Randhawa's job duties included analyzing laboratory cultures grown from blood and other bodily fluid specimens obtained from medical patients, identifying pathogens, and testing the cultures to determine their reaction to various antibiotics so that patients could receive proper treatment.

### A. History of Discipline, Job Performance Assessments, and Other Events Relevant to Randhawa's Claims

#### 1. September 25, 2009, Written Warning

On September 25, 2009, AHH issued Randhawa a written warning for non-compliance with AHH's PPE[5] policy (i.e., failure to wear gloves while working in the microbiology laboratory) and for arguing with a surveyor over the policy.[6]

#### 2. AHH Hires Randhawa's Supervisor

In or around 2013, AHH hired Bill Fleming as a microbiology lab coordinator. Fleming oversaw Randhawa's work in the laboratory. Randhawa stated he was never notified of the open position and the position was not posted on AHH's bulletin board. Randhawa further stated that from early 2013 until his employment was terminated, he noticed Fleming making "errors and false entries" in the lab; that "Fleming's way of reporting results was not acceptable by lab standards and created a dangerous situation

---

[5] Personal protective equipment.

[6] Randhawa admits in his declaration in opposition to AHH's motion that he was not wearing gloves while working in the microbiology laboratory but disputes AHH's policy required him to do so. Randhawa's claims are not based, either in whole or in part, on this disciplinary action.

5.

where doctors could be misled if it went unchecked[; and that he] informed Nina Cano …, the lab director [of the situation]."

### 3. December 2014/January 2015 Events

In or around December 2014 through January 2015,[7] Randhawa notified a doctor that contaminants had been found in a culture grown from specimens taken from the doctor's patient. According to Randhawa, he and the doctor decided additional testing was not required. Fleming asked Randhawa to do a "blood panel" on the culture but Randhawa told him it was not necessary. According to Randhawa, Fleming stated, "You stubborn Indian, do your job."

Randhawa said he complained of the "racially harassing comment" to Cano, but Cano took no further action. Randhawa complied with Fleming's requests to perform the additional testing. Fleming also performed the same tests. The results of the tests did not match. Randhawa performed the tests two additional times but could not replicate Fleming's results.

Cano discussed the incident in her declaration in support of AHH's motion. She stated Randhawa came to her "incredibly upset because Mr. Fleming called him stubborn." She said Randhawa made no mention of Fleming calling him a stubborn "Indian."[8] To corroborate her recollection, Cano produced a handwritten statement from

---

**7** In his declaration, Randhawa contends the incident occurred in or around December 2014 through January 2015. At deposition, Randhawa gave conflicting testimony that the incident occurred "between 2013 and between 2014" and also "2014 into [20]15."

**8** Randhawa was asked the following questions and gave the following answers at deposition. "Q. You told [Cano] that [Fleming] had called you stubborn, correct? [¶] A. Yes, I think I called stubborn Indian, I told her, you know. [¶] Q. Do you have a specific recollection of telling [Cano] that he called you stubborn or stubborn Indian? [¶] [Objection lodged: Asked and answered.] [¶] [A.] I think he called stubborn Indian. [¶] … Q. You think? [¶] A. Yes, he called stubborn Indian. [¶] Q. But you don't—what did you tell [Cano] though? [¶] [Objection lodged: Asked and answered, argumentative]

Randhawa complaining about the incident. The handwritten statement was written approximately two years after the alleged incident. In it, Randhawa wrote, "[Fleming] used very bad language and said don't be stub[born] and do it. No one ever used this kind of language and he[,] being Lab Coordinator[,] should know how to talk." Cano contends she counseled Fleming "about the proper language to use at work" and "told him that [his] was not the correct language to use."

Randhawa reported the differing test results to the Lab Director, Dr. Nicholas Edward Reiver. According to Randhawa, Dr. Reiver agreed with Randhawa that "the findings were faked" and recommended Randhawa notify Cano and Director Shannon Powers. Thereafter, Randhawa met with Cano, Powers, and Reiver to discuss what Randhawa described as "falsified and altered reports" by Fleming. According to Randhawa, Powers was upset by the information and considered closing the microbiology lab. Cano said she would hold regular meetings to discuss the issues. Randhawa tried to give Cano the "incorrect culture reports" but she did not take them.

Dr. Reiver was deposed but no testimony was provided in which Dr. Reiver described Fleming's test results as falsified or faked. When asked whether he had heard Randhawa "complain about errors, or false or phantom entries" made by Fleming, Dr. Reiver responded, "I was aware of complaints from Mr. Randhawa about Mr. Fleming in general." When asked about the complaints, Dr. Reiver stated, "I'm not sure of details now, but they had differences in the—in a broad sense, there were differences in the way they approached the working up of samples, of microbiology samples."

Dr. Reiver asked Cano to investigate Randhawa's claims. When asked what findings were made, Dr. Reiver responded, "the way the process was interpreted was different between the two, and between Mr. Fleming, for example, and Mr. Randhawa,

_____

[¶] … [A.] I thought stubborn Indian. Maybe [Cano's] lying, I don't know. I thought stubborn Indian."

7.

and that neither one was more right or wrong than the other in some cases. And there was a lack of pro—you know, adequate communication and understanding. [¶] There were also—there was at least one or two occasions where [Cano] felt that Mr. Randhawa was actually in violation of normal policy, so the working up of specimens."

Jose Romero (HR Romero) was the senior human performance advisor for AHH at the time of the alleged incident. He indicated that he investigated Randhawa's complaints, that Randhawa had never mentioned the "[s]tubborn Indian" remark, and "[o]nly that he was called stubborn and that it's an insult in his culture."

Cano testified concerning Randhawa's complaints, indicating Randhawa would complain about Fleming "at least … monthly." With regard to the late 2014/early 2015 complaints, Cano described the substance of Randhawa's complaints at the meeting with Randhawa, Powers and Cano, as follows: "The substance was that again [Randhawa] did not like his work being reviewed, and because [Fleming] wanted him to follow our procedures, procedures are there to safeguard patients, … and he refused to follow them." When asked whether she, Powers, or Dr. Reiver agreed that Fleming was falsifying test results, she indicated none of them agreed.[9]

### 4. January 11, 2016, Written Warning

On January 11, 2016, Randhawa received a written warning from AHH. The warning read, in part: "On 1/8/16 you [i.e., Randhawa] resulted a Susceptible Vancomycin MIC of 2 for [a] patient … when the instrument read an MIC of 8. It appears the MIC value was changed without following the correct procedure." In her declaration, Cano described the incident as follows: "[AHH] issued Mr. Randhawa a written warning for producing lab results for a patient that differed from the

---

[9]     Whether Powers was deposed is unknown. No deposition testimony or declaration from Powers was provided by either party in connection with AHH's motion.

Walkaway's[10] computerized results. Mr. Randhawa failed to repeat the test and conduct a separate test pursuant to procedures, placing patient health at risk." Randhawa does not dispute receiving the warning but disputed Cano's characterization of the incident.

At deposition, Randhawa was asked the following questions about the January 11, 2016 warning and gave the following answers:

"Q. The policy … was that you should have done a panel read and repeated the test, correct? That's what [Cano] told you.

"A. Most of the time we repeat it. You know, I have so much experience with those things. I checked it and I know what happens, that's what happened.

"Q. In this case, you felt because you had so much experience you did not need to redo the test for this culture, right?

"A. Yes. [¶] …[¶]

"Q. [Cano], however, felt that you should have redone the test, right?

"A. I—

"Q. Is that right, yes or no?

"A. That's right.

"Q. She felt that the policy was that you should redo it because you wouldn't want to risk patient safety if the organism was resistant to that particular antibiotic, correct?

"A. Yes, I know that."

### 5. Randhawa's 2016 Job Performance Assessment

On September 8, 2016, Randhawa's job performance was evaluated in writing as part of an annual assessment. Cano gave Randhawa an "overall rating of 'Key

---

**10** According to a footnote in AHH's separate statement, "The Walkaway system is the computer system used in the Microbiology Lab to identify pathogens and cultures and how the pathogens react to various antibiotics."

Contributor' for 'Regularly meets expectations; adds significant value in the department or area of responsibilities; functions within an appropriate level of supervision.' " Several additional comments were made in the performance assessment, including: "Randhawa demonstrates a commitment to doing quality work. He is a great microbiologist"; "Randhawa continues to make improvements in showing respect to fellow coworkers"; "Randhawa continues to improve and understand the necessity of promoting a positive image of the department by not placing blame on coworkers to clinicians or others outside the department"; and "Randhawa received a written warning on 1/8/16 for not following established procedures. Randhawa tends to call sterile body site cultures contaminated too quickly instead of following culture protocols."

### 6. September 2016 Verbal Warning

In her declaration in support of AHH's motion, Cano related an incident that occurred on September 20, 2016. Specifically, Cano stated she gave Randhawa a "verbal warning for again not following procedure. Mr. Randhawa had identified a carbapenem-resistant enterobacteriaceae ('CRE'), but failed to repeat the test to confirm the result." Cano contended, "It is improper procedure to finalize a CRE without repeating the test." Cano produced a computer entry in which she had previously commemorated the verbal warning to Randhawa. At deposition, Randhawa could not recall the verbal warning but did not expressly deny it occurred.

### 7. April 2017 Written Warning

On April 24, 2017, Cano issued Randhawa another written warning. The written warning noted the prior written warning of January 11, 2016, and the verbal warning of September 20, 2016. It reads, in part: "It was brought to my attention that you finalized a body fluid culture for a patient on 03/23/2017 without performing an identification and susceptibility on the Alpha Hemolytic Streptococcus isolated." The warning indicated that Randhawa's supervisor had requested Randhawa perform the "ID and susceptibility test," but Randhawa did not do so. The warning continued, "When asked about this …

10.

and as to why the body fluid culture was not handled per protocol and why you did not perform an ID and susceptibility test, you [i.e., Randhawa] stated that it was your opinion that the organisms was [*sic*] a contaminant." Areas on the written warning for employee comments and signature were left blank but a notation on the bottom of the form indicates "4/24/2017 [Randhawa] stated he wanted to write a response. [¶] 4/27/2017 [Randhawa] did not provide a response & refused to sign."

Randhawa does not dispute that the April 24, 2017 written warning was issued, but provides further information which alleges the culture only had a contaminant, that the treating physician thought further testing was unnecessary, and that Fleming subsequently performed invalid tests on the culture which identified a pathogen. Randhawa describes the results as "fake."

At deposition, Randhawa was asked the following questions and gave the following answers:

"Q. You did—you finalized a report—

"A. Yes.

"Q. —for body fluid culture for a patient—

"A. Yes.

"Q. —without performing an identification and susceptibility analysis, correct?

"A. That's what I was telling the doctor.

"Q. Is that correct?

"A. Yes.

"Q. You didn't do that because you felt that what you told the doctor was enough correct?

"A. I was telling the doctor. It's just a contaminant and they say, you know, patient is never admitted to the hospital and because they always tell me if they want extra work. [Fleming] does it, never notify the doctor. He did it just to write me up.

"Q. But you did not do any—

11.

"A. I didn't—

"Q. Let me get the question out. You did not do the identification or susceptibility analysis based on your conversation with the doctor, correct?

[Randhawa's counsel]: "Asked and answered."

[Randhawa] "I—

"Q. Is that correct?

"A. I did just identification depending on two tests. Test called PYR test. They were showing no enterococcus and nor streptococcus pneumonia and that was coming from the broth, broth of the Himedia.

"Q. Broth?

"A. Broth.[11] Yes, whatever grows in the broth that is normally a contaminant. I told the doctor, Dr. Raju, and Terry, the infection control nurse. They said, Mr. Randhawa, the patient was not in the hospital and she talked to the doctor. She didn't want—he didn't want anything more. I said that's fine.

"Q. You felt because it was a contaminant—

"A. Yes.

"Q. —you did not need to do any more testing?

"A. Yes.

"Q. The doctor does not enforce microbiology policies or procedures, right? They have nothing to do with the policies—

"A. They have nothing—

"Q. —is that correct?

"A. That's correct. I talk to the doctors, ask if you want further work-up. If she say no, then we don't do it it's just a contaminant, then I stop it there."

---

**11**    Randhawa explained in his declaration, "Broth is used in addition to regular culture plates to check for bacteria. With broth, if bacteria grows, we need to assess whether it is a real growth or a contaminant."

### 8. June 2017 Event

In his declaration, Randhawa related an additional incident that occurred in June of 2017 in which blood samples he had processed through the Walkaway system were at his workstation and, the following week, went missing. He subsequently found the samples in a storage container for positive blood cultures over two months old. He checked the reports that had been generated for the samples using the accession number printed on the sample bottles. He contends the results of the report were different from the results he had previously obtained for the samples. He "suspected" Fleming of amending the report to state a result that "was not actually possible given the circumstances." He sent the report to Cano, Dr. Reiver, Dr. Mina Raju (the treating physician), and Human Resources (HR).

The samples were then sent to the Kings County Public Health Department for analysis. According to Randhawa, the results from Kings County matched his. He notified Dr. Raju of the Kings County findings.[12] Several days later, Cano "demanded to know why [he] called Dr. Raju, to which [he] told her [he] had an obligation to notify the doctor of the results of the patient in question." Cano told Randhawa she "did not like [his] attitude."

---

[12] The Kings County Public Health Laboratory results came in on July 12, 2017. We note Randhawa, in opposition to AHH's assertion that Fleming was not Randhawa's supervisor, produced a document entitled, "Employee Counseling Action" of the same date. Other than a declaration from Randhawa's attorney that the document was produced in discovery by AHH, the only discussion of the document is contained in Randhawa's separate statement in which it was stated, without further foundation, "Fleming attempted to issue an Employee Counseling Action on July 12, 2017, in which one of the reasons listed was [Randhawa's] 'Failure to correct mistakes found by supervisor's daily review' and to which [Fleming] signed as 'Supervisor.' " We presume, from Randhawa's attorney's description of the document as an "attempt[] to issue" the Employee Counseling Action, and from the lack of any additional substantive discussion of the document, that it was not actually issued not relevant to any issue other than Fleming's alleged supervisory status.

In his declaration in support of AHH's motion, HR Romero indicated he investigated the matter but could not substantiate Randhawa's claims against Fleming. The investigation included a review of documents provided by Randhawa, visits to the microbiology lab to gain an understanding of the equipment involved in testing the cultures at issue, and interviews of Randhawa, Fleming and Cano. HR Romero concluded Fleming engaged in no improper conduct and there was no evidence of any falsified reports. When he advised Randhawa of his findings, Randhawa recommended HR Romero interview additional witnesses. HR Romero did so, interviewing a phlebotomist, and several clinical laboratory scientists [CLS's]. HR Romero wrote: "In general, the witnesses said there was friction between Mr. Fleming and Mr. Randhawa, but they did not offer any information substantiating Mr. Randhawa's claims." HR Romero's findings did not change. HR Romero contended Randhawa had asked him to terminate Fleming's employment. HR Romero consulted with Cano and the two of them decided "there was no basis to grant Mr. Randhawa's request."

Randhawa claims he later attempted to locate the Walkaway results but neither he nor technical support could find the results. He notified Cano. He ended up meeting with Cano and HR representatives to discuss the missing file. Randhawa stated Cano pulled out the results, but they were different from what they had originally said. The HR representatives then obtained the results from Fleming. Randhawa returned to the Walkaway system and discovered the report Fleming had produced was associated with a "fake" accession number and that Fleming had "input fake values and used a panel that is no longer used in microbiology." He reported the instance to AHH headquarters and they recommended he file a grievance with HR.

At the end of June 2017, Randhawa gave AHH a packet of handwritten documents complaining about Fleming (including the previously described non-contemporaneous, handwritten document in which Fleming was alleged to have used "very bad language" and called Randhawa stubborn.) In the documents, Randhawa alleged numerous errors

committed by Fleming in the lab. Randhawa frequently described those errors as purposeful in an attempt to get Randhawa in trouble or to have him fired.

HR Romero stated in his declaration, "Fleming, as the Microbiology Coordinator, was responsible for checking the work of other employees in the department. He could also amend reports as he saw fit. In the instances that Mr. Randhawa was complaining about, Mr. Fleming in his role as Microbiology Coordinator had appropriately amended a report that Mr. Randhawa had worked on based on a doctor's request to conduct further testing. Mr. Randhawa did not like it when Mr. Fleming amended his reports."

Cano confirmed Fleming had authority to amend the reports of the microbiologists and CLS's under his supervision. At deposition, she was asked "Do you have any information that Mr. Fleming amended Mr. Randhawa's reports without Mr. Randhawa's knowledge?" She responded, "So as—yes, I was aware of that, but that was part of his duties, was to correct reports. And he corrected them based on doing workup to identify the actual organisms, because he had not followed protocol. Mr. Randhawa had not followed protocol. So, [Fleming] had to follow the protocol, and then he would amend the report."

At deposition, Randhawa was asked whether Fleming had the "authority to do further testing on organisms if asked by a doctor." Randhawa acknowledged Fleming had that authority and that "It was his duty to check the final results." In fact, Randhawa admitted that he himself corrected reports prepared by others.

### 9. Randhawa Files His First Complaint with the DFEH

On November 13, 2017, Randhawa filed a complaint with the DFEH in which he alleged he was subject to discrimination, harassment, and retaliation. He received a right to sue letter on January 3, 2018

### 10. Final Written Warning Issued November 2017

On November 20, 2017, Cano issued Randhawa a final written warning. Cano contended she did not know at the time (and would not learn until after Randhawa's

15.

subsequent employment termination) that Randhawa had filed the first of his two DFEH complaints just one week earlier. There is nothing in the record to suggest Cano was aware Randhawa had filed a DFEH complaint one week earlier.

The November 2017 written warning concerned a complaint received from a physician about a report Randhawa had provided the physician and which conflicted with other information the physician received from AHH. According to the warning, the physician had asked Randhawa for his opinion on a culture that was being worked on by another microbiologist and Randhawa indicated the culture had a contaminant (as opposed to a pathogen). However, the warning states that, at the time Randhawa gave his opinion to the physician, Randhawa knew "a Streptococcus mitis had been identified and the sensitivity was still in progress." According to the warning, Randhawa did not consult with the other microbiologist and, ultimately, the inquiring doctor was given two different results. The doctor "was very upset" and "requested the culture be sent to Kaweah Delta Hospital" for confirmation. The warning stated, "your actions has [*sic*] put our physician confidence in our department at risk."

The final written warning describes Randhawa as being unreceptive when the matter was brought to his attention. It states Randhawa felt no need to consult with other microbiologists. It further states Randhawa became " 'confrontational and started yelling' " at Cano; explained how if he were the director, he would "get rid of [Fleming] and the microbiologist who did the initial results." A human performance representative was present and asked Randhawa to stop yelling. Randhawa complied, but soon raised his voice again. When asked to lower his voice again, Randhawa did so but then "requested to leave afterward stating [he was] done with the conversation." Finally, the warning describes a meeting in which Randhawa was "asked to face [Cano] to listen to information being provided about teamwork and expected guidelines. [Randhawa] refused and turned away." Randhawa does not dispute the warning was issued but disputes the facts underlying the warning. In particular, Randhawa disputed the facts

16.

pertaining to the microbiological findings. In his declaration, Randhawa denied raising his voice or yelling stating that it was HR Romero who was yelling at him.

Randhawa testified HR Romero asked him, "why did you give your opinion to [the physician] without discussing with [CLS] Pam Whitmore[?]" When asked what he said in response, Randhawa testified, "I said, [HR Romero], my opinion is my opinion. I don't have to ask Pam Whitmore because she's not very specialty [*sic*] in micro. I give my opinion and my opinion is my opinion, so that's why [the physician] said, Mr. Randhawa, thank you very much for your opinion."

### 11. Randhawa Goes on Medical Leave

The following day, November 21, 2017, Randhawa went on medical leave. Randhawa claimed he needed to "recover from the anxiety disorder, vertigo, severe stress and insomnia [he] developed as a result of the hostile work environment" created by Fleming, Cano and HR Romero. On August 22, 2018, Randhawa's doctor released him to work effective November 22, 2018.

### B. *Termination of Randhawa's Employment*

### 1. Randhawa is Deposed in His Workers' Compensation Case

On March 9, 2018, while on medical leave, Randhawa filed a claim for workers' compensation. He was deposed in that matter on August 31, 2018. During his deposition, Randhawa admitted copying and taking home medical records in paper and electronic format containing PHI without the consent of the hospital or the affected patients. On September 5, 2019, during his second day of deposition, Randhawa changed his testimony to deny the records contained PHI. In doing so, however, he admitted that the documents contained patient medical records numbers. Patient medical records are considered PHI. (45 C.F.R. § 164.514(b)(2)(i)(H).)

17.

## 2. AHH Sues Randhawa for the Return of its Medical Records

On October 4, 2018, AHH filed suit against Randhawa in Fresno County Superior Court seeking, among other things, the return of AHH's medical records that Randhawa had admitted copying and taking home with him.[13]

On November 5, 2018, the Fresno County Superior Court granted AHH's request for a preliminary injunction and ordered Randhawa, his agents, servants, employees, successors, assigns and attorneys to: "1. Return all third-party medical records to [AHH]. [¶] 2. Delete digital copies of all third-party medical records that [Randhawa] has stored on his computer, iPhone, or any storage device or program, specifically including, but not limited to USB drives, I Cloud, I Drive, Google Drive, One Drive or any similar devices or programs. [¶] 3. Notify all persons to whom he provided third-party records of this Preliminary Injunction and demand that all such persons return the third-party medical records to [AHH]."

## 3. AHH Terminates Randhawa's Employment

Having learned of Randhawa's admission of taking home patient medical records without proper authority, AHH terminated Randhawa's employment on November 20, 2018, two days prior to his scheduled return to work from his medical leave of absence.

## 4. Further Confirmation of Randhawa Alleged HIPAA Violations

On June 12, 2019, AHH served a third-party subpoena on Randhawa's prior attorneys. In her declaration, AHH's counsel stated the subpoenaed attorneys produced "several documents that contained private and confidential patient information and medical records that [Randhawa] could only have obtained through his employment with [AHH]. The documents and medical records were not redacted and still in the possession of the [law firm]." Per her declaration, AHH's counsel attached copies of the records and

---

[13] *Hanford Community Hospital v. Joginder Randhawa* (Super. Ct. Fresno County, 2019 No. 18CECG03689).

18.

noted that her firm "redacted the PHI that was exposed when we received the records." A review of the records indicates the following types of information were redacted: the patient's name and ID, date of birth, medical records number, and date/time of service.

**5. Fresno County Superior Court's Contempt Order Against Randhawa**

On March 5, 2020, the Fresno County Superior Court found Randhawa in contempt for violating the court's November 5, 2018, preliminary injunction. In its decision, the court noted Randhawa had agreed to allow a forensic search of his computer and phone in an effort to demonstrate his compliance with the court's injunction. The search revealed 11 additional documents containing PHI. The court determined Randhawa had willfully disobeyed the preliminary injunction by retaining medical records containing PHI.

**DISCUSSION**

**I.     Standard of Review**

A trial court's grant of summary judgment is reviewed de novo. (*Samara v. Matar* (2018) 5 Cal.5th 322, 338.) "We consider all the evidence offered in connection with the motion, except that which the trial court properly excluded."[14] (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1067.) "Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion." (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*).) "The court's stated reasons for granting summary judgment are not binding on us because we review its ruling, not its

---

[14]    The trial court properly declined to take judicial notice of a February 7, 2019 decision by the California Unemployment Appeals Board rendered in favor of Randhawa. Such decisions may not be used as evidence in separate proceedings between an employer and its employee. (Unemp. Ins. Code, § 1960.) Randhawa does not challenge this determination on appeal.

19.

rationale." (*Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1168.)

"In reviewing a grant of summary judgment, an appellate court must make its own independent determination of the construction and effect of the papers submitted…. The reviewing court applies the same three-step analysis as that of the trial court: (1) identification of issues framed by the pleadings; (2) determination of whether the moving party has established facts which negate the opponent's claim [or demonstrates a complete defense] and justify a judgment in movant's favor; and (3) determination of whether the opponent demonstrates the existence of a triable, material factual issue." (*Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 886-887; *Bashi v. Wodarz* (1996) 45 Cal.App.4th 1314, 1318.)

## II. General Rules Governing Summary Judgment and Summary Adjudication

"A party may move for summary judgment … if it is contended that the action has no merit." (Code Civ. Proc., § 437c, subd. (a)(1).) "A defendant … has met his or her burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action … cannot be established, or that there is a complete defense to the cause of action. Once the defendant … has met that burden, the burden shifts to the plaintiff … to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (*Id.* at subd. (p)(2).) A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Id.* at subd. (c).)

"A motion for summary adjudication … is nearly identical to a motion for summary judgment … except that instead of disposing of the entire case, a summary adjudication disposes of only select causes of action, affirmative defenses, claims for damages, or issues of duty." (O'Connor's Cal. Practice (2022 ed.) Civil Pretrial, ch. 10-C, § 1) "A motion for summary adjudication shall be granted only if it completely

20.

disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (Code Civ. Proc., § 437c, subd. (f)(1).)

## III. Medical Leave Discrimination and Age Discrimination

Randhawa does not challenge the trial court's grant of summary adjudication as to his sixth and seventh causes of action for alleged medical leave discrimination and discrimination based on age, respectively. We will affirm the trial court's summary adjudication of those claims without further discussion.

## IV. Whistleblower Retaliation

Randhawa brought his cause of action for whistleblower retaliation pursuant to Labor Code sections 1102.5 and 1102.6.

### A. *Labor Code Sections 1102.5 and 1102.6*

Labor Code section 1102.5 provides, in relevant part: "An employer … shall not retaliate against an employee for disclosing information … to a government or law enforcement agency … , to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance …, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." (Lab. Code, § 1102.5, subd. (b).)

Labor Code section 1102.6 provides, "In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5." (Lab. Code, § 1102.6.) Among other things, Labor Code section 1102.6 provides an employer with a "new statutory affirmative defense to employer liability for retaliation in violation of the

21.

whistleblower statute when the employer can show that it would have made the same decision for legitimate and independent reasons." (Assem.Com. on Judiciary, Analysis of Sen. Bill 777 (2003-2004 Reg. Sess.) as amended May 29, 2003; *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal. 5th 703, 712 (*Lawson*).)

### B. *Labor Code Section 1102.6 Changed the Framework for Evaluating Whistleblower Retaliation Claims*

#### 1. *Lawson* **Rejects Prior Framework for Analyzing Whistleblower Retaliation Claims.**

Prior to the enactment of Labor Code section 1102.6, Labor Code section 1102.5 "supplied only a set of substantive protections against whistleblower retaliation, unaccompanied by any provision setting forth procedures for proving retaliation. [Citation.] So to give life to those substantive protections, courts looked to analogous statutory schemes for procedural guidance. Much as courts had done in employment discrimination and retaliation cases brought under [FEHA], courts in section 1102.5 cases generally adopted the three-part *McDonnell Douglas* burden-shifting framework."[15] (*Lawson*, *supra*, 12 Cal.5th at p. 709.)

Courts adapting the *McDonnell Douglas* test to Labor Code section 1102.5 claims described the test, as follows: "First, a plaintiff who seeks to rely on circumstantial evidence must establish a prima facie case of retaliation, meaning ' " 'a plaintiff must show that she engaged in protected activity, that she was thereafter subjected to adverse employment action by her employer, and there was a causal link between the two.' " ' [Citation.] Second, if the plaintiff has established a prima facie case, the burden of production shifts to the employer to come forward with evidence of 'a legitimate, nondiscriminatory reason for the adverse employment action.' [Citation.] Third, if the employer produces substantial evidence of a legitimate nondiscriminatory reason, then

---

[15] *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*).

22.

the plaintiff bears the burden of proving the reason was a pretext for impermissible retaliation." (*Lawson*, *supra*, 12 Cal.5th at p. 710.)

After Labor Code section 1102.6 was enacted in 2003 (Stats. 2003, ch. 484, § 3) (Senate Bill No. 777), some courts continued to apply the "meaningfully different, burden-shifting framework borrowed" from the *McDonnell Douglas* case. (*Lawson*, *supra*, 12 Cal.5th at p. 707.) As a result of this "lack of uniformity, the United States Court of Appeals for the Ninth Circuit … asked [the state's high court] to decide which of these frameworks governs section 1102.5 retaliation claims."[16] (*Lawson*, at p. 707.) Our high court concluded Labor Code section 1102.6 is the proper framework to apply and that "employees need not satisfy the *McDonnell Douglas* test to make out a case of unlawful retaliation." (*Lawson*, at p. 707.)

At the request of AHH, and because *Lawson* was decided after the parties in the instant appeal had completed their initial briefing, we permitted the parties to file simultaneous letter briefs to discuss the effect of *Lawson* on Randhawa's appeal.

In its letter brief, AHH argues this court should still affirm the trial court's summary judgment because, in response to AHH's evidence in support of its motion (1) Randhawa was unable to make a "threshold showing he engaged in protected activity"; and (2) "applying the standards articulated in *Lawson*, [Randhawa's Labor Code] section 1102.5 claim still fails because the record is undisputed that (i) Randhawa's alleged 'whistleblowing' was not a contributing factor in his discharge, and (ii) AHH has submitted unrebutted, clear and convincing evidence that it would have discharged Randhawa anyway for his admitted, serious misconduct—namely, taking home 30 patient medical records, which contained [PHI], and storing them in an unsecured location for six months without authorization, violating HIPAA."

---

[16]    See *Lawson v. PPG Architectural Finishes, Inc.* (9th Cir. 2020) 982 F.3d 752.

23.

Randhawa's letter brief emphasizes his contentions that his alleged disclosures of PHI were protected activity [i.e. "preserving the unlawfully falsified records and reporting the falsifications to management"], that his termination was based on that very activity, and that, "[u]nder *Lawson*, Randhawa has therefore met his burden of producing evidence that his exercise of his rights under the HIPAA whistleblower provisions was a contributing factor to [AHH's] termination." Randhawa stated, "[AHH] cannot prove by clear and convincing evidence … that it had an independent reason—it admits it terminated Randhawa for preserving that very evidence of falsified records."

## 2. Post-Lawson Cases

AHH contends this court should affirm the judgment and its disposition of Randhawa's Labor Code section 1102.5 claim by applying the *Lawson* holding to the undisputed evidence—despite AHH having initially presented its motion utilizing the *McDonnell Douglas* framework. In support of its position, AHH relies on *Vatalaro v. County of Sacramento* (2022) 79 Cal.App.5th 367 (*Vatalaro*).

In *Vatalaro*, the trial court granted the defendant's motion for summary judgment of the plaintiff's Labor Code section 1102.5 claim utilizing the three-part *McDonnell Douglas* test. (*Vatalaro*, *supra*, 79 Cal.App.5th at p. 371.) While the appeal of the judgment was pending before the Third District Court of Appeal, *Lawson* was decided. The appellate court authorized supplemental briefing to discuss the effect of *Lawson* on the appeal and ended up affirming the judgment. (*Vatalaro*, *supra*, at pp. 383-384.) Specifically, the court found the defendant's evidence of a legitimate business reason for taking adverse employment action against the plaintiff met the "clear and convincing" standard provided in Labor Code section 1102.6, and that the plaintiff failed to raise a triable issue in that regard. (*Vatalaro*, at pp. 383-384.) Thus, even though the defendant presented its motion for summary judgment utilizing the *McDonnell Douglas* framework, the *Vatalaro* court determined the defendant's evidence was sufficient to meet the standard set forth in Labor Code section 1102.6 and *Lawson*.

24.

A different approach was taken by the Second District Court of Appeal in *Scheer v. Regents of the University of California* (2022) 76 Cal.App.5th 904 (*Scheer*). In *Scheer*, the defendant moved to summarily adjudicate the plaintiff's Labor Code section 1102.5 claim under the *McDonnell Douglas* framework. (*Scheer*, at p. 914.) The defendants (i.e., the employer produced evidence to demonstrate they had a legitimate business reason for taking adverse employment action against the plaintiff. (*Scheer*, at pp. 911-912.) The trial court found the plaintiff " 'fail[ed] to meet the burden to provide specific and substantial responsive evidence that the employer's proffered reasons were untrue or pretextual' " and granted the defendants' motion for summary judgment. (*Ibid.*)

On appeal, the defendant argued the court should review the case under the *Lawson* framework (i.e., through application of Labor Code section 1102.6) and affirm the judgment. (*Scheer, supra*, 76 Cal.App.5th at p. 914.) The *Scheer* court declined and, instead, held, "[b]ecause the moving papers failed to employ the applicable framework prescribed by Labor Code section 1102.6, the [defendant] failed to meet [their] initial burden in moving to summarily adjudicate" the plaintiff's whistleblower retaliation cause of action. (*Scheer, supra*, 76 Cal.App.5th at pp. 914, 915.) The *Scheer* court stated, "[o]ur role as an appellate court is to review the trial court's order on the motion the [defendants] actually made in the trial court, not to rule in the first instance on whether the [defendants] are entitled to summary adjudication on the … cause of action in light of the Labor Code section 1102.6 framework." (*Scheer*, at p. 915.)

Here, neither party takes the position it would be inappropriate for this court to apply the *Lawson* framework to the current appeal. Notably, Randhawa invoked Labor Code section 1102.6 in opposing AHH's summary judgment motion and, as a result, was aware of, and had within his contemplation, the appropriate standard for evaluating his whistleblower retaliation claim. Moreover, AHH's motion is premised largely upon alleged admissions made by Randhawa during his various depositions in this case and in his workers' compensation case. Under these circumstances, we believe it appropriate to

25.

substantively review the summary adjudication of Randhawa's whistleblower retaliation cause of action using the *Lawson* framework and Labor Code section 1102.6.[17]

### C. Analysis of Whistleblower Retaliation Evidence (First Cause Of Action)

AHH moved for summary adjudication of Randhawa's whistleblower retaliation claim on numerous grounds: (1) Randhawa's inability to establish a prima facie case of retaliation; (2) Randhawa did not engage in protected activity; (3) Randhawa could not show a causal link between any purported protected activity and AHH's decision to terminate his employment; (4) AHH had a legitimate business reason to terminate Randhawa's employment; and (5) Randhawa has no evidence to show AHH's proffered reason for terminating his employment was pretextual. In asserting the first three grounds, AHH contended it negated a necessary element of Randhawa's claim. The fourth and fifth grounds raised by AHH will be reviewed under the clear and convincing standard set forth in Labor Code section 1102.6 and whether Randhawa was able to demonstrate a triable issue with regard to the defense.

Three elements must be satisfied in order to make out a prima facie case of whistleblower retaliation: (1) the plaintiff engaged in protected activity; (2) the plaintiff was subjected to adverse employment action; and (3) a causal link between the two previously stated elements. (*Lawson*, *supra*, 12 Cal.5th at p. 710.)

The alleged protected activity at issue are of two types: Randhawa's reports to management of alleged "falsification" of medical test reports, and Randhawa's taking home of medical records to preserve evidence. Generally, there are two types of adverse employment actions at issue: i.e., the written warnings Randhawa received and the eventual termination of his employment.

---

[17] In so deciding, we take no position on the alternative approach taken in *Scheer*, *supra*, 76 Cal.App.5th 904.

### 1. Randhawa's Reports to Management re: Fleming

With regard to Randhawa's reports of alleged "falsification" of medical test reports, AHH has demonstrated through the evidence that Randhawa's use of the term "fake" reports was meant to convey Fleming having changed values in his reports and amending his test results based upon Fleming's own work and analysis with which Randhawa disagreed. Randhawa admitted it was within Fleming's authority, as a clinical laboratory scientist and as lab coordinator, to correct Randhawa's reports when Fleming found errors. Fleming's authority to do so was also confirmed by HR Romero and Cano.

By its very language, Labor Code section 1102.5 protects disclosures where an employee has "reasonable cause to believe" his reports to management disclose a violation of law. (*Id*. at subd. (b).) Assuming, without deciding, Randhawa had reasonable cause to believe he was reporting behavior that violated the law, we note that none of the written warnings received by Randhawa indicate the warnings were based on Randhawa's reporting of Fleming's work. Rather, the September 2009 written warning was for failure to wear gloves in violation of AHH's PPE policy and arguing over the policy; the January 2016 written warning was for changing an MIC value "without following the correct procedure" of repeating a process and conducting an "e-test" to confirm the value used; the September 2016 verbal warning (which Randhawa does not recall and does not base his claims upon) was for failure to follow proper procedure (i.e., failure to repeat a test to confirm results as required by established procedure); the April 2017 written warning was for finalizing a patient culture without performing a proper identification susceptibility procedure and for failing to perform it when asked; and the final written warning in November 2017 for providing test results to a physician when the samples being tested were still in process by another CLS and without consultation with that CLS, and for insubordinate behavior when the matter was discussed with Randhawa.

AHH did not challenge the characterization that the above warnings constitute adverse employment actions. Accordingly, we also assume, for purposes of our analysis,

27.

that Randhawa has sufficient evidence to meet the second element of a Labor Code section 1102.5 claim—i.e., adverse employment action.

Notwithstanding, the evidence submitted by AHH of proffered reasons for the above warnings was sufficient to demonstrate there was no causal connection between Randhawa's reports concerning Fleming and the warnings. Accordingly, we consider whether Randhawa has submitted evidence sufficient to raise a triable issue of fact concerning such a causal connection.

As previously mentioned, Randhawa does not appear to contend the 2009 warning was retaliatory. It predated Fleming's employment with AHH by several years. Randhawa admitted the behavior upon which the warning was based.

With regard to the January 2016 written warning Randhawa admits he refused to run the test panel at the request of Fleming. Although Randhawa contends in his separate statement that Fleming called him a "stubborn Indian" in connection with the incident, we note Randhawa states in his declaration that the remark was made "[i]n or around December 2014 through January 2015," one year prior to the written warning.

As to the April 2017 written warning based on Randhawa's alleged failure to perform "ID and susceptibility test[ing]," Randhawa admitted not performing the test "because [the] doctor never needed it." In response to the related UMF contained in AHH's separate statement, Randhawa contends he was justified in not performing the test because the doctor indicated it was not needed, that his initial results were correct, and because later performed tests would be invalid.

With regard to the final written warning he received in November of 2017, Randhawa admits the violation—i.e., that he provided a doctor with his opinion without consulting with the scientist that was working with the patient samples. He contends "Cano wrote up Randhawa simply because he found a different contaminant found commonly on the human body."

Thus, Randhawa admits engaging in the conduct that led to the various written warnings being issued to him. What he fails to do, however, is to demonstrate a causal connection between his receipt of the warnings and his reporting of alleged false or fake test reporting by Fleming. Randhawa submitted no evidence to meaningfully dispute that the alleged policy violations were, in fact, policy violations.[18] He submitted no evidence that others were not similarly disciplined when committing similar policy violations. Randhawa only offers speculation that Fleming was falsifying test results in order to get Randhawa into trouble. No evidence was produced to create an inference that Randhawa was disciplined because he complained about Fleming.

Consequently, as to the alleged protected activity Randhawa engaged in, Randhawa failed to meet his burden of demonstrating a triable issue of fact as to a causal connection between the alleged protected activity and the written warnings he received. Randhawa's suspicions that these warnings were issued because of his reporting of Fleming's amendment of test results is insufficient to meet his burden.

This alone, however, would not dispose of the entire cause of action for whistleblower retaliation since it does not address the termination of employment which Randhawa alleges was retaliatory. We address that aspect of Randhawa's claim below.

## 2. Termination of Randhawa's Employment

AHH submitted evidence to demonstrate it had a legitimate reason for taking adverse employment action against Randhawa. With regard to its decision to terminate Randhawa's employment, AHH based its decision on Randhawa's own sworn deposition testimony that Randhawa had taken home numerous AHH medical records containing

---

[18] The only evidence Randhawa submitted in this regard was Fleming's testimony on April 7, 2020. When asked if he was "aware of a written protocol … that requires that if after 48 hours the Walkaway test is negative for streptococcus and peritoneal fluid a written requirement to do another test after 72 hours?" Fleming responded, "All I can say is possibly."

PHI. Randhawa admitted that the records he took home contained patient names, medical record numbers, and dates of service. He admitted the records were the property of AHH and that he did not have the consent of either AHH or the patients to take the information home. He admitted taking the records home because he might need them in the future to make a further case against Fleming. Although he attempted to change his testimony in a deposition taken nearly a year after his employment was terminated, his subsequent testimony still indicated the records he took home contained PHI, i.e., medical records numbers (45 C.F.R. § 160.103; 45 C.F.R. § 164.514(b).)[19]

Somewhat inconsistently, Randhawa contends on appeal that his conduct in bringing the records home was both inadvertent and an effort at preserving evidence of Fleming's allegedly illegal conduct. He admits the records were in both digital and paper format and his wife was asking him what he was going to do with those papers.[20] Randhawa's wife appears to have had access to the records although there is no evidence she actually reviewed the records.

Randhawa also contends giving the records to his prior attorneys was a permitted disclosure under HIPAA pursuant to part 164.502(j) of title 45 of the Code of Federal Regulations. That provision reads, in relevant part:

> "A covered entity is not considered to have violated the requirements of this subpart if a member of its workforce or a business associate discloses [PHI], provided that: [¶] (i) The workforce member … believes in good faith that the covered entity has engaged in conduct that is unlawful or

---

[19] Randhawa's ineffective denial is further belied by the documents AHH's counsel received upon subpoenaing Randhawa's prior attorneys and by the Fresno County Superior Court's finding of contempt.

[20] Randhawa testified his wife asked him about the medical records he took home. In discussing the records, Randhawa testified, "They [i.e., Cano and other management] were supposed to take paper—they didn't take any paperwork from me. I was so frustrated so I drove home. Kept those papers in my drawer. After six months there was no meeting, never … discussed those issues in the meeting, so my wife says why are you keeping those papers here? So I shred all those papers."

otherwise violates professional or clinical standards, or that the care, services, or conditions provided by the covered entity potentially endangers one or more patients, workers, or the public; and [¶] (ii) The disclosure is to ... [¶] (B) An attorney retained by or on behalf of the workforce member … for the purpose of determining the legal options of the workforce member … with regard to the conduct described." (45 C.F.R. § 164.502(j).)

Randhawa's contention that taking medical records home with him and giving those records to his attorney was itself protected activity under HIPAA was not raised before the trial court. "In general, new theories of defense may not be raised for the first time on appeal. [Citation.] However, a new theory raising a pure question of law on undisputed facts can be raised for the first time on appeal." (*Fort Bragg Unified School Dist. v. Colonial American Casualty & Surety Co.* (2011) 194 Cal.App.4th 891, 907 (*Fort Bragg*).)

Whether Randhawa gave his attorneys medical records containing PHI in order to determine his legal options with respect to Fleming's conduct is not a pure question of law, nor is it supported by undisputed facts. Nowhere in Randhawa's declaration in opposition to AHH's motion for summary judgment does Randhawa discuss whether, or why, he gave the records to his attorneys.[21] At deposition, Randhawa could not recall giving the documents to his attorneys. Consequently, there was no evidence or argument before the trial court upon which to make a determination of whether Randhawa's act of giving AHH medical records to his attorneys fell within the scope of part 164.502(j) of title 45, Code of Federal Regulations. Randhawa has forfeited the argument. (*Fort Bragg, supra*, 194 Cal.App.4th at p. 907.)

AHH submitted evidence that Randhawa was not engaged in a protected activity in copying medical records in hard copy and converting them to pdfs, taking both types of records home with him, keeping them for six months or more, and that there is no *causal* connection between Randhawa's complaints about Fleming's test reporting and

---

[21]    In addition to this lawsuit, Randhawa was represented by counsel in connection with his workers' compensation case.

31.

the termination of his employment for HIPAA violations. AHH submitted evidence to show that its termination of Randhawa's employment was based on willful violations of HIPAA and of AHH policies.

AHH had established policies designed to protect patient confidentiality. It had a regime of disciplinary action for violations of the policy. Four violation levels were possible with a Level 4 violation being deemed the most serious.[22] Randhawa was trained on HIPAA and was on notice of, and knew, AHH policies with regard to patient confidentiality. AHH's policies provided for Level 4 sanctions in the event of a willful violation of HIPAA that may cause patient and/or organizational harm.[23] Level 4 sanctions included termination of employment. AHH demonstrated that "[i]n the past three years, at least seven other AHH employees [had] been terminated" for violations

---

[22] The following are examples of the Level 1 through Level 3 violations under AHH's policies: Level 1 violations are for accidental or inadvertent violations caused by "inattentiveness, lack of understanding, lack of training, or other human error" including, without limitation "[a]ccessing one's own medical record" and "[i]ncorrectly typing a patient's medical record number and viewing the incorrect patient's PHI or other confidential information"; Level 2 violations are for "failure to follow established privacy and security policies and procedures … due to poor job performance or lack of performance improvement" including, without limitation, "[s]econd offense of any level 1 violation," circumventing privacy and securities policies "in order to perform a designated task more quickly or efficiently," and "[f]ailure to sign off from or lock computer when leaving a workstation"; Level 3 violations are for "deliberate or purposeful violation[s] due to curiosity or a desire to gain information for personal use" including, without limitation, "[s]econd offense of any level 2 violation," "[a]llowing another workforce member to utilize systems after one has logged in," "[i]ntentional failure to secure PHI or other confidential information," and "[i]ntentionally discussing patient care/situations with other healthcare individuals without a 'need to know.'"

[23] AHH's HIPAA policy provides examples of Level 4 violations including, without limitation, "Subverting network controls or escalating privileges without permission or authority to do so"; and "Willfully accessing patient information without a legitimate, job related reason (i.e., snooping) and/or disclosing the information to another party not involved in the care of the patient, regardless of intent."

AHH's Privacy Official, Marcus Glascock, considered "less egregious" than those of Randhawa.[24]

The evidence submitted by AHH was sufficient to shift the burden to Randhawa to demonstrate a triable issue of fact with respect to whether his alleged HIPAA violations constituted protected activity and with respect to whether there was a causal connection between the termination of his employment and his complaints about Fleming.

Randhawa admitted he copied the patient records to "create a case against Fleming" and that he removed them, took them home, and kept them there for six months. Storing medical records at one's home for the purpose of building a case against a fellow employee does not create a triable issue as to whether there was a permitted disclosure of those records. More clear, however, is the fact that Randhawa failed to submit evidence sufficient to create a triable issue of material fact as to whether his complaints against Fleming (which we assume, for purposes of analysis, were protected activities) were the cause of his employment termination.

We also conclude AHH's evidence in support of its proffered legitimate business reason for terminating Randhawa's employment and its contention it would have made the same business decision even if Randhawa had not complained of the alleged protected activity of reporting Fleming's conduct meets the evidentiary standard of clear and convincing evidence. (See Labor Code, § 1102.6.) Our state high court has described the evidentiary standard, as follows: " 'Clear and convincing' evidence requires a finding of high probability. This standard is not new. We described such a test, 80 years ago, as requiring that the evidence be ' "so clear as to leave no substantial

---

**24**    Glascock indicated he was involved in each of those terminations and described them. Examples included, without limitation, employee's "accessing the medical chart of a co-worker who was being treated in the emergency room without a medical reason to do so"; and an employee "accessing their own electronic medical records" and those "belonging to her son without proper authorization." The race (but not identity) of those terminated employees was disclosed and included three Caucasians and four Hispanics.

doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " (*In re Angelia P.* (1981) 28 Cal. 3d 908, 919; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998-999.)

The conduct for which Randhawa's employment was terminated was admitted by him at deposition. Randhawa's admissions meet the clear and convincing evidentiary standard. Randhawa has not demonstrated a triable issue of fact in that regard.

## V.     Disability Discrimination and Race Discrimination

Randhawa's second cause of action for disability discrimination and eighth cause of action for race discrimination are brought under subdivision (a) of Government Code section 12940.[25] Subdivision (a) of Government Code section 12940 provides, in part:

> "It is an unlawful employment practice …: [¶] (a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (Gov. Code, § 12940, subd. (a).)[26]

---

[25]     Randhawa's second cause of action for disability discrimination also includes allegations AHH failed to engage in the interactive process to arrive at reasonable accommodations for Randhawa's disability in violation of subdivisions (m) and (n) of Government Code section 12940. Because Randhawa's third and fourth causes of action address these contended violations, we discuss them in connection with his third and fourth causes of action.

[26]     Exceptions to the statutory proclamation of unlawfulness contained in subdivision (a) of Government Code section 12940 include, without limitation, situations where the applicant's or employee's disability or medical condition prevents the applicant or employee from performing the essential duties of their job position, or from performing those essential duties in a manner that would not endanger the health or safety of the applicant, employee, or others. (Gov. Code, § 12940, subd. (a)(1) & (a)(2).) Other exceptions exist in situations not relevant to this appeal. (See *id.* at subd. (a)(3), (a)(4), (a)(5).)

AHH moved to summarily adjudicate Randhawa's claim of disability discrimination on the following grounds: (1) Randhawa's complaint was devoid of any substantive facts to support his cause of action; (2) Randhawa could not make out a prima facie case of disability discrimination; (3) AHH terminated Randhawa for legitimate and nondiscriminatory reasons; and (4) Randhawa could not demonstrate AHH's reason for termination was untrue or pretextual.

AHH moved for summary adjudication of Randhawa's claim of race discrimination on the following grounds: (1) the claim was barred by the applicable statute of limitation; (2) Randhawa was unable to establish a prima facie case of race discrimination—i.e., he is unable to show he was capable of competently performing his job, and he is unable to demonstrate a discriminatory motive or bias on the part of AHH; (3) Randhawa's complaint was devoid of any substantive facts in support of the claim; (4) AHH had a legitimate and non-discriminatory reason to terminate Randhawa's employment; and (5) Randhawa could not provide substantial evidence that AHH's reasons for termination were untrue or pretextual.

*Lawson* did not affect the manner in which FEHA discrimination and retaliation claims are evaluated. FEHA discrimination and retaliation claims continue to adhere to the *McDonnell Douglas* "three-stage burden-shifting test." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*); *Department of Corrections & Rehabilitation v. State Personnel Bd.* (2022) 74 Cal.App.5th 908, 924.) For the convenience of the reader, we quote a succinct formulation of the test: "Under the three-part test developed in *McDonnell Douglas* … '(1) The complainant must establish a prima facie case of discrimination; (2) the employer must offer a legitimate reason for his actions; (3) the complainant must prove that this reason was a pretext to mask an illegal motive.' " (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 68.)

To establish a prima facie case of discrimination under Government Code section 12940, a "plaintiff must provide evidence that (1) he was a member of a protected class,

35.

(2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz, supra*, 24 Cal.4th at p. 355.)

In moving for summary adjudication of a FEHA discrimination cause of action, an employer may choose to meet its burden by challenging the plaintiff's ability to make out a prima facie case of discrimination. In addition (or in lieu thereof), the employer may choose to "proceed[] directly to the second step of the *McDonnell Douglas* formula" and produce competent, admissible evidence of its nondiscriminatory reason for terminating the plaintiff's employment. (*Guz, supra*, 24 Cal.4th at pp. 357, 360.)

In the case of a FEHA discrimination claim, an employer meets his initial burden on summary judgment by either negating an essential element of the employee's claim or by showing a legitimate, nondiscriminatory reason for the adverse employment action. (*Guz, supra*, 24 Cal.4th at p. 356.) Once that burden is met, the employee "must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004-1005.)

Here, the written warnings issued by AHH to Randhawa, on their face, evidence no discriminatory motive. AHH produced competent, admissible evidence demonstrating its nondiscriminatory reasons for issuing written warnings to Randhawa. The evidence was sufficient to negate the causation element of Randhawa's FEHA discrimination cause of action. Likewise, it was sufficient to meet the second step of the *McDonnell Douglas* test - i.e., proffering a legitimate, nondiscriminatory reason for issuing the written warnings. Thus, it was incumbent upon Randhawa to submit substantial evidence

36.

of discriminatory motive in order to create a triable issue of fact concerning causation and to show AHH's proffered reasons were pretextual.

### A. Disability Discrimination

The trial court granted summary adjudication of the discrimination claims due to the fact that Randhawa admitted "no one at AHH treated him differently due to any alleged disability," and "no one at AHH made any negative or derogatory remarks due to any alleged disability, or because he took a leave of absence." Randhawa did not dispute the aforementioned facts. Randhawa merely stated that "it is also undisputed that [AHH] terminated [Randhawa's] employment while he was on disability leave." Randhawa's deposition testimony confirms he did not think anyone at AHH treated him differently because of any perceived disability.

The essence of a discrimination claim is that a person is treated differently because of his protected status. (See *Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 138, fn. 2; *Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 49.) Randhawa's admission that he was not treated differently than others as a result of his alleged disability and race, and that he was not subjected to any sort of negative or derogatory remarks due to his disability, is fatal to his claim of disability discrimination.

AHH submitted sufficient evidence to demonstrate it had legitimate reasons for taking adverse employment action against Randhawa. The burden shifted to Randhawa to create a triable issue of fact with regard to such matters. Randhawa did not do so. The fact that Randhawa was terminated while on disability leave is insufficient to establish a prima facie case of disability discrimination. This fact does not constitute substantial evidence that AHH acted with a discriminatory animus or that AHH's reason for termination was untrue or pretextual.

The trial court was correct in granting AHH's motion with respect to Randhawa's second cause of action for disability discrimination.

### B. Race Discrimination

At deposition, Randhawa was asked "Do you believe that anyone at [AHH] treated you differently because of your race?" Randhawa responded, "No, because I stay in microbiology, nobody else involved. Similarly, Randhawa was asked at deposition, "During the time you were employed with [AHH] did anyone treat you differently because of your national origin or your religion?" Randhawa responded, "I will say no, but the thing is I worked myself for 13, 14 years running the lab by myself and then Luann was my coordinator for two years. She was getting upset with Pam Whitmore so she resigned. This just started when Bill Fleming came around in 2013. I think to start 2013 or first or second week of 2013 I remember." He was then asked, "Going back to my question, though, no one treated you differently because of your national origin or religion, correct?" Randhawa responded in the affirmative.

In its separate statement, AHH contended it was an undisputed material fact that Randhawa "testified that no one ever treated him differently because of his race during his employment." In his separate statement in opposition to AHH's motion, Randhawa disputed the aforementioned fact and contended AHH mischaracterized Randhawa's testimony. The evidence Randhawa provided was that Bill Fleming had allegedly called Randhawa a "stubborn Indian."

There is a dispute over whether Fleming called Randhawa "stubborn" or a "stubborn Indian." Fleming denied calling Randhawa a "stubborn Indian" but admitted calling him stubborn. Cano and HR Romero contend Randhawa only reported Fleming having called him "stubborn" and not a "stubborn Indian." Randhawa's handwritten note of the incident only references the "stubborn" remark and not a remark of "stubborn Indian." Notwithstanding, we accept Randhawa's contention that Fleming made the latter comment as opposed to the former. (*Regents*, *supra*, 4 Cal.5th at p. 618 ["Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion."]. There is

38.

evidence that Fleming made a single, derogatory, racial remark sometime in or around December 2014 through January 2015.

AHH argued, and the trial court found that the "stubborn Indian" remark is barred by the statute of limitations. We agree.

The applicable limitation period within which Randhawa was required to file his administrative complaint with the DFEH for race discrimination was one year. (Former Gov. Code, § 12960, subd. (d) (Stats. 2005, ch. 642, § 1).)[27] Randhawa testified the alleged racial remark occurred no later than January 2015. Yet, he did not file his first DFEH complaint until more than two years later, in November of 2017.

Citing the "continuing violation doctrine," Randhawa contends the limitation period had not expired. "Under that doctrine, an employer is liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct that occurred within the limitations period." (*Yanowitz v. L'Oreal USA, Inc.*

---

[27] Government Code section 12960 was amended in 2017, 2019, and 2020. (Stats. 2017, ch. 799, § 13, eff. Jan. 1, 2018 (Assem. Bill No. 1556); Stats. 2019, ch. 709, § 1, eff. Jan. 1, 2020 (Assem. Bill No. 9); Stats. 2021, ch. 278, § 3, eff. Jan. 1, 2022 (Sen. Bill No. 807).) Up until January 1, 2020, the statue was straightforward in denoting a one year limitation period. Thereafter, the manner by which the limitation period was stated was altered dramatically. However, it appears the one year limitation period still governs race discrimination claims. (See Gov. Code, § 12960, subd. (e)(1) ["A complaint alleging a violation of Section 51, 51.5, 51.7, 54, 54.1, or 54.2 of the Civil Code shall not be filed pursuant to this article after the expiration of one year from the date that the alleged unlawful practice … occurred."]; Civ. Code, § 51, subd. (b) [full and equal rights to accommodations, advantages, facilities, privileges, services may not be denied on account of "sex, race, color, religion, ancestry, national origin, disability"] *Id*. at § 51.5, subd. (a) ["No business … shall discriminate against … any person in this state on account of any characteristic listed … in subdivision (b) … of [Civil Code section] 51.].) To the extent a party may argue for a longer limitation period, it would not apply retroactively to Randhawa's claim. (*Andonagui v. May Dept. Stores Co.* (2005) 128 Cal.App.4th 435, 440 [amended statute enlarging limitation period will not revive time-barred actions unless Legislature expressly intended revival].)

(2005) 36 Cal.4th 1028, 1056 (*Yanowitz*).)  The continuing violation doctrine occurs "if the employer's unlawful actions are (1) sufficiently similar in kind—recognizing … that similar kinds of unlawful employer conduct, such as acts of harassment or failures to reasonably accommodate disability, may take a number of different forms [citation]; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence." (*Richards v. CH2M Hill, Inc*. (2001) 26 Cal.4th 798, 823.)

The trial court correctly rejected Randhawa's continuing violation theory of liability.  Randhawa has neither alleged nor produced evidence that any similar comments were made or similar conduct engaged in.  The continuing violation doctrine requires a sufficiently similar course of conduct. (*Richards v. CH2M Hill, Inc*., *supra*, 26 Cal.4th at p. 823; *Yanowitz, supra*, 36 Cal.4th at p. 1059.)

AHH met its burden on summary judgment.  It negated a necessary element of Randhawa's race discrimination cause of action—namely, that there was a discriminatory motive in the adverse employment actions taken against Randhawa.  Randhawa was unable to produce substantial evidence of a discriminatory motive.

Moreover, with regard to AHH's termination of Randhawa's employment, AHH provided a legitimate business reason for its action—i.e., Randhawa's admission he copied and took medical records belonging to AHH home with him for the purpose of preserving his ability to make a case to HR against Fleming in the future.  The medical records, by his own admission contained PHI.  This was not a protected activity under HIPPA and was a violation of AHH policy.

Randhawa's efforts at demonstrating AHH's termination of his employment was pretextual fell short.  Contrary to Randhawa's claims, he was treated consistent with other employees who had violated AHH's HIPAA policies.  The violation constituted the most serious violation of the policy, a Level 4 violation.  AHH submitted evidence to show that, in the last several years, AHH terminated the employment of seven employees found to have committed a Level 4 violation of the policy.  The sole exception to this, as

40.

relied upon by Randhawa, was the termination of an employee who worked at a different facility under different management.

Moreover, the initial recommendation to terminate Randhawa's employment for Randhawa's HIPAA violations came from AHH's Privacy Official, Marcus Glascock, who had no prior knowledge of Randhawa. The only individual accused of making a derogatory racial remark to Randhawa four years earlier (i.e., Fleming) was no longer employed by AHH when the decision to terminate Randhawa's employment was made.

Finally, Randhawa contends the temporal proximity between his filing of his 2017 DFEH complaint and his employment termination one year later satisfies his burden of demonstrating AHH's reason for terminating his employment was pretextual. We disagree. Temporal proximity alone, if it exists, is insufficient to demonstrate pretext. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 868 (*Serri*); *Loggins v. Kaiser Pemanente Internat.* (2007) 151 Cal.App.4th 1102 (*Loggins*).)

Summary adjudication of Randhawa's eighth cause of action for race discrimination was proper.

## VI. Failure to Engage in Good Faith Interactive Process

In his third cause of action, Randhawa alleges AHH violated subdivision (n) of Government Code section 12940 for "fail[ing] to engage in a timely, good faith, interactive process with [Randhawa] to determine effective reasonable accommodations for [Randhawa's] disabilities" and that AHH "discouraged [Randhawa] from taking further leave."

Subdivision (n) of Government Code section 12940 provides:

> "It is an unlawful employment practice …: [¶] … [¶] (n) For an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." (Gov. Code, § 12940, subd. (n).)

41.

The elements of a claim for failure to engage in the interactive process are, as follows: (1) the defendant was a covered entity; (2) plaintiff was an employee; (3) the basis of plaintiff's limitations were known to defendant; (4) plaintiff requests reasonable accommodation to perform his essential job duties; (5) plaintiff was willing to participate in the process; (6) defendant failed to participate in a timely good faith interactive process; (7) plaintiff was harmed; (8) failure to engage in good faith interactive process was substantial factor in causing plaintiff's harm. (CACI 2546.)

It is undisputed that Randhawa never requested an accommodation other than his leave of absence. In response to the evidence that Randhawa was granted his request for a leave of absence, Randhawa disputes this evidence by noting Randhawa was terminated while he was on his leave of absence—one week before his scheduled return.

"Although the interactive process is an informal process designed to identify a reasonable accommodation that will enable the employee to perform his or her job effectively [citation], an employer's failure to properly engage in the process is separate from the failure to reasonably accommodate an employee's disability and gives rise to an independent cause of action [citation]." (*Swanson v. Morongo Unified School Dist.* (2014) 232 Cal.App.4th 954, 971 (*Swanson*).)

Randhawa's evidence in opposition to AHH's motion to summarily adjudicate this cause of action is not relevant to an alleged failure to engage in the interactive process. The evidence is undisputed that Randhawa never requested reasonable accommodations to perform his essential job duties. Absent such a request, AHH's duty to engage in the interactive process was not triggered.

Summary adjudication of Randhawa's third cause of action was appropriate.

## VII. Failure To Reasonably Accommodate Disabilities

Randhawa's fourth cause of action alleges "[AHH] failed to make reasonable accommodations for the disabilities of [Randhawa]" in violation of subdivision (m) of Government Code section 12940 which provides:

42.

"It is an unlawful employment practice …: [¶] … [¶] (m)(1) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee. Nothing in this subdivision or in paragraph (1) or (2) of subdivision (a) shall be construed to require an accommodation that is demonstrated by the employer or other covered entity to produce undue hardship, as defined in subdivision (u) of Section 12926, to its operation. [¶] (2) For an employer or other entity covered by this part to, in addition to the employee protections provided pursuant to subdivision (h), retaliate or otherwise discriminate against a person for requesting accommodation under this subdivision, regardless of whether the request was granted." (Gov. Code, § 12940, subd. (m).)

"The elements of a failure to accommodate claim are (1) the plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability." (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1009-1010.)

"A reasonable accommodation is any ' "modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." ' [Citation.] Reasonable accommodations include '[j]ob restructuring, part-time or modified work schedules, reassignment to a vacant position, ... and other similar accommodations for individuals with disabilities.' [Citations.] [¶] An employer has an 'affirmative duty' to reasonably accommodate a disabled employee [citation], and that duty is a ' " 'continuing' " ' one that is ' " 'not exhausted by one effort.' " ' [Citation.] A single failure to reasonably accommodate an employee may give rise to liability, despite other efforts at accommodation. [Citation.] The FEHA, however, does not require an employer to make an accommodation 'that is demonstrated by the employer or other covered entity to produce undue hardship ... to its operations.' " (*Swanson*, *supra*, 232 Cal.App.4th at pp. 968-969.)

Thus, the purpose of the FEHA in requiring employers to engage in the interactive process and to reasonably accommodate a disabled employee is to enable that employee

to perform his essential job functions.  (*Swanson*, *supra*, 232 Cal.App.4th at pp. 968-969.)  But the employer is not required to make accommodations that cause the employer undue hardship.  (*Id*. at p. 969.)  Having determined AHH's reason for terminating Randhawa was legitimate and nondiscriminatory, as established by clear and convincing evidence, we cannot simultaneously impose a duty on AHH to provide reasonable accommodations for an employee it had the right to discharge from his employment.  Requiring AHH to keep Randhawa employed and to provide reasonable accommodations to Randhawa in order to enable him to perform his essential job functions would constitute an undue hardship on AHH.

We conclude the trial court was correct in summarily adjudicating this cause of action in favor of AHH.

## VIII.  Medical Leave Retaliation

In his fifth cause of action, Randhawa alleges "[AHH] took adverse employment actions against [Randhawa] in retaliation for [Randhawa's] attempts to and exercise of [Randhawa's] rights to medical leave under Gov[ernment] Code [section] 12945.2 and in retaliation for [Randhawa's] opposition to [AHH's] opposition to [AHH's] interference with [Randhawa's] rights."  Randhawa contends this violated Government Code section 12945.2 (CFRA)[28], including current subsection (k) of said statute.[29]

Subdivision (k) of Government Code section 12945.2 provides:

> "(k) It shall be an unlawful employment practice for an employer to refuse to hire, or to discharge, fine, suspend, expel, or discriminate against, any individual because of any of the following:  [¶]  (1) An individual's exercise of the right to family care and medical leave provided by subdivision (a).  [¶]  (2) An individual's giving information or testimony as

---

[28]    Moore-Brown-Roberti California Family Rights Act of 1993.  (Gov. Code, §§ 12945.1-12945.2; Cal. Code Regs., tit. 2, § 11087, subd. (b).)

[29]    Randhawa's complaint cites to former subdivision (l) of Government Code section 12945.2.  That subsection has been redesignated as subdivision (k) without further amendment.  We refer to the subdivision by its current designation (i.e., subdivision (k)).

to the individual's own family care and medical leave, or another person's family care and medical leave, in any inquiry or proceeding related to rights guaranteed under this section." (Gov. Code, § 12945.2, subd. (k).)

"The elements of a cause of action for retaliation in violation of CFRA are: ' "(1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA [leave]; (3) the plaintiff exercised her right to take leave for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse employment action, such as termination, fine, or suspension, because of her exercise of her right to CFRA [leave]." ' [Citation.] Like claims for discrimination, CFRA retaliation claims … are subject to the *McDonnell Douglas* burden-shifting analysis." (*Bareno v. San Diego Community College Dist.* (2017) 7 Cal.App.5th at p. 560.)

Randhawa's medical leave retaliation claim is premised on Randhawa's contention that AHH terminated Randhawa's employment because he exercised his right to take medical leave. As with other causes of action, AHH has produced admissible evidence demonstrating it had a legitimate, nondiscriminatory/nonretaliatory motive for terminating Randhawa's employment.

In his opposition, Randhawa relied on the fact that his employment was terminated while he was still on medical leave—i.e., he was terminated one week before his scheduled return to work.[30] This fact is insufficient to demonstrate pretext. (*Loggins*, *supra*, 151 Cal.App.4th at pp. 1112-1113; *Serri*, *supra*, 226 Cal.App.4th at p. 868.)

We conclude the trial court was correct in summarily adjudicating Randhawa's fifth cause of action for medical leave retaliation.

## IX. Retaliation for Opposing FEHA Violations

Randhawa alleges in his ninth cause of action that "[AHH] took adverse employment actions against [Randhawa] substantially motivated by, and in retaliation for

---

[30] Randhawa also cited to his responses to paragraphs 29 through 34, 59, 60-62, and his additional issues of material fact at paragraphs 78 through 174. A review of this evidence reveals it is irrelevant to the issue.

[Randhawa's] opposition to [AHH's] violation of FEHA." Randhawa contends AHH, by doing so, violated Government Code sections 12940 (discrimination), 12945.2 (family/medical leave) and references, in that regard, Government Code sections 12920 and 12926. Randhawa further contends AHH's alleged retaliation violated subdivision (h) of Government Code section 12940.

Government Code section 12926 is a definitional section of FEHA—providing numerous definitions of terms used in FEHA. Government Code section 12920 declares a policy of the state. It provides, in part: "[T]he practice of discrimination because of race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, marital status, national origin, ancestry, familial status, source of income, disability, veteran or military status, or genetic information in housing accommodations is declared to be against public policy." (Gov. Code, § 12920.)

As with other retaliation claims, to establish a prima facie case of retaliation for opposing FEHA violations, "the plaintiff must show that he engaged in a protected activity, his employer subjected him to adverse employment action, and there is a causal link between the protected activity and the employer's action." (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476; *Yanowitz, supra*, 36 Cal.4th at p. 1042.)

Again, plaintiff has negated the "causal link" element of Randhawa's claim by producing admissible evidence it had legitimate, nonretaliatory reasons to undertake the adverse employment actions at issue. Randhawa largely admitted the underlying conduct upon which each of those adverse employment actions were premised. Randhawa has not produced substantial evidence to create a triable issue of fact in connection with this element or to demonstrate AHH's proffered reasons for its actions were pretextual.

We will affirm the trial court's grant of summary adjudication with respect to Randhawa's ninth cause of action.

## X.     Failure to Prevent Discrimination and Retaliation

In his opening brief on appeal, Randhawa states that his tenth cause of action for failure to prevent discrimination is derivative of his other claims for retaliation and discrimination.

AHH's challenge to Randhawa's tenth cause of action, and Randhawa's opposition thereto, are based largely on the same evidence and arguments produced by AHH and Randhawa, respectively. Having found in favor of AHH on those causes of action, the result here must be the same. Consequently, we will affirm the trial court's grant of summary adjudication as to Randhawa's tenth cause of action.

## XI.     Wrongful Termination in Violation of Public Policy

Randhawa states that his eleventh cause of action for wrongful termination "is derivative of all the other claims in the case, particularly the whistleblower and FEHA retaliation claims set forth at the outset of the case."

The elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge caused the plaintiff harm. (*Yau v. Allen* (2014) 229 Cal.App.4th 144, 154.)

AHH's challenge to Randhawa's eleventh cause of action, and Randhawa's opposition thereto, are based on the same evidence and contentions raised in connection with Randhawa's Labor Code section 1102.5 and FEHA causes of action. Again, having found in favor of AHH on those causes of action, we will affirm the trial court's summary adjudication of Randhawa's eleventh cause of action.

## XII.    Punitive Damages

AHH moved to summarily adjudicate Randhawa's claim for punitive damages. We have determined the trial court's grant of summary adjudication as to each of Randhawa's causes of action was appropriately granted, Consequently, we will affirm

the trial court's grant of summary judgment.  Because none of Randhawa's claims survive, there is no basis upon which to grant a claim for punitive damages and we need not discuss that issue in this opinion.

## **DISPOSITION**

The judgment in favor of AHH is affirmed.  AHH is entitled to its costs on appeal.


                                              SMITH, J.

WE CONCUR:


FRANSON, Acting P. J.


SNAUFFER, J.